Gary Kurtz, SBN 128295
**LAW OFFICE OF GARY KURTZ**
 A Professional Law Corporation
20335 Ventura Boulevard, Suite 200
Woodland Hills, California 91364

Telephone:   818-884-8400
Telefax:      818-884-8404
e-Mail:       Gary@garykurtzlaw.com

Local counsel for ESTATE OF DAVID R. FOSTER
(see last page for all counsel)

FILED
2012 MAR 12  AM 10: 14
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF DAVID R. FOSTER, by its Executor Sarah Foster,<br><br>Plaintiff,<br><br>vs.<br><br>AEHUI GOMER, DONNA WHITE, YONG SAM CHANG, a/k/a MICHAEL CHANG, and SUNG HUI KIM,<br><br>Defendants. | Case No.    2:11-CV-01242-AHM-DTB<br><br>FIRST AMENDED COMPLAINT FOR DAMAGES<br><br>JURY TRIAL DEMANDED<br><br>1. RICO<br>2. RICO Conspiracy<br>3. Elder Abuse<br>4. Breach of Fiduciary Duty<br>5. Constructive Fraud<br>6. Fraud<br>7.  Conversion<br>8. Unjust Enrichment |

Plaintiff Estate of David R. Foster, by its Executor Sarah Foster, as for its first amended complaint against Aehui Gomer, Donna White, Yong Sam Chang, and Sung Hui Kim states and alleges as follows:

## PLAINTIFF

1.     David R. Foster was born May 24, 1920 and died on June 4, 2010.  At the time of his death, Foster's estate was worth as much as $20 million.  Foster's estate included three homes located in Rancho Mirage, California; Nantucket, Massachusetts; and New York, New York.  Foster's estate is being probated in the State of California, Riverside County Court.  David R. Foster and the Estate of David R. Foster are interchangeably referred to herein as "Foster."

2.     Foster was the former CEO and chairman of the Board of Directors of Colgate-Palmolive.  He retired from Colgate-Palmolive in 1979.

3.     Foster was married three times.  His first marriage ended in divorce and produced no issue.  Foster married his second wife, Patricia Anne Foster, in 1955.  Foster had two daughters with Patricia Anne Foster: Sarah Foster and Victoria Foster.  Patricia Anne Foster died on June 25, 1994.

4.     Alexandra Chang ("Chang") was Foster's third wife.  When Foster was 76 years old, Foster and Chang were married in California in May of 1996.  Foster was fifteen years older than Chang.  Foster's third marriage produced no issue.  Chang died on January 31, 2008.  During the course of their marriage, Foster progressively experienced worsening dementia and the deleterious effects of lifelong

alcoholism. As Foster's mental capacity diminished, Chang increasingly attempted to transfer Foster's assets and their community property to herself and/or her siblings. Foster did not consent and was not capable of consenting to the transfers instigated by Chang. The transfers were the result of her undue influence over Foster and were made in breach of Chang's fiduciary duties to Foster. Chang's financial abuse of Foster was interrupted by her untimely death but was promptly resumed and elevated by her sister, Aehui Gomer.

## DEFENDANTS

5.     Aehui Gomer ("Gomer") is the sister of Chang, Foster's third wife. Gomer resides at 114 Hawkin Road, Tabernacle, New Jersey. Upon the death of Alexandra Chang, Gomer became the self-appointed and sole caregiver to Foster. Gomer took unfair and fraudulent advantage of Foster's incapacitation. She positioned herself to control all of Foster's property and finances and isolated Foster from his daughters, elder protection workers, and others who were genuinely concerned for his well-being. Depending upon the level of his lucidity, Gomer would falsely represent or encourage Foster to believe that she was Chang and/or that she (Gomer) loved Foster and wanted to marry him. Upon information and belief, Gomer was married to her husband at all relevant times. Gomer also falsely represented to Foster that his daughters did not love him and had no interest in caring for him. Gomer also regularly threatened Foster with placement in a nursing home if he refused to heed her demands.

6.     Upon information and belief, Donna White ("White") is an individual who currently resides in Boston, Massachusetts. At all times relevant to this action, White was an attorney licensed to practice in the Commonwealth of Massachusetts and the State of Maine. White has been a partner with the following Boston law firms: Bingham, McCutchen; Donovan Hatem LLP; Prince, Lobel, Glovsky & Tye; and Pierce Atwood LLP. White purports to be an attorney specializing in trust and estate law and administration. White began providing estate planning advice to Foster and Chang in January 2005. During Chang's life and after her death, White knowingly used her position as Foster's attorney to further the unlawful efforts of Chang and Gomer to divert Foster's assets to the Chang Family.

7.     Yong Sam Chang is an individual who resides in Douglaston, New York. Yong Sam Chang is the brother of Chang and is the co-executor of Chang's estate, which Yong Sam Chang filed for probate in California.

8.     Sung Hui Kim ("Kim") is an individual who resides in Dallas, Texas. Kim is the sister of Chang and is the co-executor of Chang's estate, which Kim filed for probate in California.

## SUBJECT MATTER JURISDICTION

9.     This action is brought under the federal Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961, *et seq.*, and various other state common law doctrines or statutes. Jurisdiction is vested in this Court by virtue of 28 U.S.C. § 1331. Foster's claims brought under Massachusetts and California law are so

related to Foster's federal claims, over which the Court has original jurisdiction, that they form part of the same case or controversy.  Under Article III of the United States Constitution, the Court has jurisdiction over Foster's state common law and statutory claims pursuant to 28 U.S.C. § 1367.

10.    In the alternative, this Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000.00 exclusive of costs and interest.

## VENUE AND PERSONAL JURISDICTION

11.    A substantial part of the events and omissions giving rise to the claims stated herein occurred in this District and a substantial part of the property that is the subject of this action is situated in this District.  Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2).

12.    Defendants Gomer, Yong Sam Chang, and Kim moved for this Court to dismiss Foster's initial complaint pursuant to Rule 12(b)(6), without contesting the Court's exercise of personal jurisdiction and thereby consented to this Court's exercise of personal jurisdiction over them.

13.    Defendants Gomer, Yong Sam Chang, and Kim have also sought the protections of California law by (among other things) causing the Estate of Chang to

be probated in Riverside County, California and have thereby purposefully availed themselves of minimum contacts with the forum for purposes of this action.

14.     Pursuant to 18 U.S.C. § 1965(b), the ends of justice require that the Court exercise personal jurisdiction over White.

15.     Defendants engaged in a multi-district conspiracy to defraud Foster, and his estate, of money or property.  In particular, Foster's money or property, which was the target of Defendants' conspiracy, consisted of (among other things):

  a.     Foster's principal residence in Rancho Mirage, California.

  b.     Foster's residence in Nantucket, Massachusetts.

  c.     Foster's residence in New York, New York.

  d.     Foster's shares of Colgate-Palmolive, initially in the custody of Merrill Lynch's Palm Springs, California office, and later moved by Chang to the Merrill Lynch Office in San Francisco.

  e.     Foster also held accounts at Wells Fargo (California) and JP Morgan (New York) that were a target of Defendants' conspiracy.

16.     Defendants orchestrated and participated in their conspiracy from their residences, which were located throughout the United States.

  a. Throughout her marriage to Foster, Chang lived with Foster at his residences in California, New York, and Massachusetts.

  b. Prior to Chang's death, Gomer resided in New Jersey.  In an effort to control Foster's finances and to isolate him from persons who would

protect his interests, Chang (prior to her death) authorized Gomer to pay Foster and Chang's bills. As a result, Chang caused all of the bills and account statements relating to Foster's property located in California, New York, and Massachusetts to be sent to Gomer's residence in New Jersey. After Chang's death, Gomer assumed Chang's leadership role in the conspiracy to defraud Foster and travelled with Foster to his residences in California, New York, and Massachusetts for the purpose of maintaining control of Foster's person and finances.

    c. Yong Sam Chang, an executor of Chang's California Probate Estate, is a resident of New York.

    d. Sung Hui Kim, an executor of Chang's California Probate Estate, is a resident of Dallas, Texas.

17. White orchestrated and participated in Defendants' conspiracy to defraud Foster of money or property from her place of residence and through the law firms with which she was affiliated.

    a. At all times relevant, White resided in Massachusetts.

    b. White is an attorney licensed to practice in Massachusetts and Maine.

    c. Prior to April 2006, White was "of counsel" to the law firm of Bingham McCutchen LLP, which has offices in California and Massachusetts, among other states. Hilary Pierce, an attorney in Bingham McCutchen's San Francisco Office, assisted White in Changs' and

Foster's estate planning and advised White on aspects of California law, enabling White to more effectively structure Foster's estate under California law for purposes of perpetrating the fraud.

d. In her effort to defraud Foster by charging him for legal services that were contrary to Foster's interests, White mailed letters and invoices from her law offices in Massachusetts to Foster's residence in California.

18.    White traveled from Massachusetts to New York to meet with Foster and Chang on May 16, 2005. During this meeting, and pursuant to White's advice, Foster and Chang revoked their Premarital Agreement, executed a Third Amendment to the David and Alexandria Foster ("DAF") Trust, executed an Advance Healthcare Directive pursuant to the California Probate code, and executed the Sixth Amendment to the Foster Family Trust ("FFT"). Although executed in New York, all of these documents were governed by California law. As a consequence of these actions, Chang was able to directly control a substantial portion of Foster's assets.

19.    On June 30, 2005, the Merrill Lynch office in Palm Springs, California sent White (in Massachusetts) a letter, noting that it received her paperwork regarding title changes to the Foster trust accounts. White thereafter sent more documents to Merrill Lynch. On July 15, 2005, White sent, among other things, original executed documents, from Massachusetts to Merrill Lynch, San Francisco.

20.   In 2006, White prepared a trust on behalf of Chang.  The trust presumed that Foster would predecease Chang.  Upon Chang's death, the trust would distribute Foster's California, New York, and Massachusetts properties to Chang's siblings and would bequeath $200,000 to White's daughters.

21.   In a letter dated January 24, 2008, Chang sent her final written instructions from Rancho Mirage, California to White in Massachusetts: "I trust you [White] will use your utmost intelligent mind to execute the problems in our favor . . . ."  Chang also reminded White that Foster's Colgate-Palmolive shares had been transferred from Merrill Lynch's office in Palm Springs, California to its office in San Francisco, California.   White (Massachusetts) communicated with Merrill Lynch (California) by telephone and email to facilitate the opening of trust accounts and to answer questions.

22.   On January 31, 2008, Chang died in Rancho Mirage, California.  Gomer flew from her home in New Jersey to Foster's home in Rancho Mirage, California; Gomer gathered all of the jewelry in Foster's California home and flew back with the jewelry to New York; Gomer then returned to California as the self-appointed administrator of the estate of Chang.  Gomer transferred the jewelry from California to New York with White's assent. Yong Sam Chang also transported the keys to Foster's locked closet, where Chang had sequestered many of Foster's valuables, from California to New York and later returned the keys to California upon Foster's demand.

23.   Foster (California) called White (Massachusetts) on February 4, 2008, after discovering items missing from his home and after Gomer refused to unlock a closet.  Foster asked for White's assistance in preventing Gomer from obtaining possession of his property and asked several questions about his estate.  White obfuscated information and fraudulently concealed material facts from Foster.

24.   On February 28, 2008, White in Boston sent a letter to Foster in California, enclosing a Durable Power of Attorney ("DPOA"), a health care directive, a Fourth Amendment to the DAF Trust, and a Seventh Amendment to the FFT.  All of these documents were prepared by White in Boston, were governed by California law, and were executed by Foster in California on March 17, 2008.  Pursuant to these documents, Gomer was able to effectively assume control over all of Foster's money and property.

25.   On October 16, 2008, White (Massachusetts) emailed Gomer (New Jersey) with regard to their conspiracy to cause Foster to pay Chang's estate taxes:

I am checking in to see where Benjamin [Lam of ML San Francisco] is in the liquidation of the Colgate Shares that are to be distributed from the survivor's trust.  We will need the liquid funds to pay the tax with the extension to file [Chang's] estate tax return.  I know at least 20,000 shares have been sold.

26.   On or about October 25, 2008, Gomer caused Merrill Lynch – San Francisco to liquidate a portion of Foster's Colgate-Palmolive shares and to wire

$1,885,000 from an FFT subtrust in California to the trust account of White's law firm in Massachusetts to be used for the payment of Chang's estate taxes.   As a result, Defendants achieved one objective of their conspiracy to defraud Foster, i.e., the use of Foster's assets to pay Chang's estate taxes.

27.   In order to achieve the objectives of the conspiracy to defraud Foster, it was critical for Defendants to commence the administration of Chang's estate. Chang's will was filed in the Probate Court for Riverside County, California on November 28, 2008. Yong Sam Chang of New York and Sung Hui Kim of Texas were appointed executors of the estate.   White was the estate's initial counsel and prepared a draft Form 706 and circulated correspondence explaining various distributions that would be made from Chang's estate.   White was replaced by a California attorney in April 2009.   The Form 706 that was ultimately filed by Chang's estate was substantially the same Form 706 that was drafted by White.

28.   In 2009, the Massachusetts GAL interviewed Pierce, White's California law partner, who explained why Chang's estate was probated in California and the advantages of California probate law to achieve the objectives of the conspiracy. White also confirmed to the GAL "that it was expected that Mr. Foster would be considered a California domiciliary when he died."

29.   The multi-district nature of Defendants' conspiracy is further evidenced by Defendants' multiple acts of interstate mail / wire fraud, *infra*, at ¶ 168, and by all events and circumstances described in *infra*, at ¶¶ 32-176.

30.    There is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators.  Yong Sam Chang and Sung Hui Kim have no apparent or alleged contacts with Massachusetts relating to the conspiracy.  Moreover, although Yong Sam Chang resides in New York, Sung Hui Kim has no apparent or alleged contacts with New York, and White's contacts with New York (for purposes of the alleged conspiracy) are less substantial than her contacts with California.

31.    White also purposefully availed herself of minimum contacts with California (*see infra*, at ¶¶ 32-176).

## BACKGROUND

32.    On May 15, 1987, Foster and Patricia Anne Foster formed the FFT. Foster and Patricia Anne Foster were trustees, with the survivor being the beneficiary.  The FFT was executed in Palm Springs, California and was governed by California law.

33.    Patricia Ann Foster died on June 25, 1994.  Shortly after Patricia's death, the FFT was divided into three sub-trusts in accordance with the terms of that Trust: the Survivor's Trust, the Marital Trust, and the Credit Trust.

34.    Foster was entitled to the net income from all three trusts during the remainder of his life.  Foster was also entitled to principal from the Survivor's Trust and had the power to alter, amend, or revoke the Survivor's Trust.  Foster had the

most control over the Survivor's Trust (as opposed to the Marital or Credit Trusts), and for this reason the Survivor's Trust was called upon most often to fund whatever estate planning Foster was convinced to do first by Chang and later by Gomer.

35.   Foster was also able to use principal from the Credit Trust and Marital Trust for his maintenance and support, but Foster did not have the authority to alter, amend, or revoke either the Credit Trust or the Marital Trust.   Foster and Robert Brock ("Brock"), Foster's long term accountant, were co-trustees of the FFT.

**Initial Years of the Foster / Chang Marriage**

36.   On May 24, 1996, Foster married Chang in Rancho Mirage, California. Chang was a Korean native and the oldest of six children, five of whom immigrated to the United States.   At the time of her marriage to Foster, Chang worked as a translator.

37.   On May 22, 1996, Foster and Chang executed a Premarital Agreement. The Premarital Agreement was governed by California law and provided that Foster would create the David and Alexandra Foster Trust ("DAF Trust").   The Premarital Agreement further required that:

- the DAF trust be funded with the residence in Rancho Mirage, California, $100,000, and 25,000 shares of Colgate-Palmolive stock in the custody of Merrill Lynch's Palm Springs, California office (later transferred by Chang to the Merrill Lynch Office in San Francisco, California);

- in the event of Foster and Chang's divorce, Chang would be entitled to the contents of the DAF Trust and nothing else;

- in the event of either Foster's or Chang's death, the surviving spouse would be entitled to the contents of the DAF Trust;

- Foster would serve as trustee of the DAF Trust and Chang would serve as successor trustee.

38.   On February 27, 1997, Foster executed the DAF Trust, which was constructed in accordance with the Premarital Agreement and governed by California law.  Specifically, in the event of divorce Chang would receive the contents of the DAF Trust, which included the residence in Rancho Mirage, California, and nothing else.  In the event that either Foster or Chang were to pass away then the survivor of them would receive the contents of the DAF Trust. The Trust contained no provisions for any other parties.  The DAF Trust named Chang as successor trustee, gave her the power to appoint co-trustees to serve alongside her.

39.   Chang discouraged Foster's involvement with his daughters.  Chang was reluctant to socialize with anyone outside of her own friends and family.  As a result, Foster became more and more isolated throughout his marriage to Chang.  Foster's isolation became more pronounced as his mental capacity diminished and he became more dependent upon Chang for his physical care and security.

40.     In general, Foster and Chang spent their summers in Massachusetts and wintered at the home in Rancho Mirage, California, and made occasional trips to their residence in New York City.

41.     An employee reports that Chang repeatedly told Foster that his daughters did not love him.  Another employee recounts how Chang directed their phone calls away from Foster.

42.     As early as 2003, Chang authorized Gomer to manage and pay bills on behalf of Foster and Chang.   As a result, most of Foster's bills, bank statements and Merrill Lynch account statements were sent to Gomer's New Jersey address, ostensibly for bill paying purposes.  Foster became more and more marginalized in the day-to-day management and knowledge of his business affairs.   Apart from Chang, Gomer knew more about Foster's financial affairs than anyone else.

**Foster's Health Fails**

43.     On May 9, 2003, the 82 year-old Foster had surgery to remove a non-cancerous tumor in the lining of his brain.  Neurosurgical consultation notes state that Chang reported that Foster "has changed significantly from what he was prior to that at least for the previous five years".  She reported that he tended to fall asleep all the time, gave wrong numbers when talking, and that his memory and ability to concentrate were poor.

44.     On September 3, 2003, Foster executed the "Restatement of Trust - The David and Alexandra Foster Trust" ("Restatement"), which was governed by

California law.  Chang also executed to indicate her assent "as to form and content." The Restatement was consistent with the 1997 DAF Trust, as amended, but implemented a significant change.  In the event that Chang was the first to die, and there was any Colgate-Palmolive stock in the DAF Trust, then 50% of the stock would be distributed to Foster and the remaining 50% would be distributed among six beneficiaries, i.e., four of Chang's siblings (living in New Jersey, New York, and Texas) and Foster's two daughters (living in New York and Massachusetts).  If Foster died first, then the contents of the DAF Trust would pass to Chang (just as would have occurred prior to the Restatement).

45.   Additionally, Schedule A of the Restatement added the Nantucket property into the DAF Trust.

46.   This Restatement was a significant departure from Foster's prior estate plans.  Foster had long promised his daughters that they would receive the Nantucket property upon his death.  The Nantucket property was the Foster Family's consistent home during the more than 40 years that Foster was married to Patricia Ann Foster and during the childhood of Sarah and Victoria Foster.  Over the years and on numerous occasions, Foster either discussed with or wrote to his accountant and attorney about his intention that his daughters be the ultimate recipients of his Nantucket home.

47.   The changes made to Foster's Estate by the Restatement are the direct and proximate result of Foster's mental incapacitation, the exercise of Chang's

financial abuse, fraudulent intent, undue influence, and the breach of fiduciary duties owed by Chang to Foster.

48.   On January 19, 2005, Chang (California) wrote a letter to Thomas Peckham ("Peckham"), an estate planning attorney in Boston.   Chang informed Peckham that Foster's California attorney Paul Selzer had refused to sign documents related to the Foster / Chang Estate.   Chang stated that Selzer was concerned that he would be attacked by Sarah and Victoria Foster after Foster died, presumably because the documents overly favored Chang.

49.   When Selzer refused to cooperate with Chang's estate planning, Chang requested that he terminate his services to the Fosters.

50.   In early 2005, Chang (in California) retained White (in Massachusetts) to assist her in her effort to wrongfully alter Foster's estate plan and to distribute his estate in a manner contrary to his intentions.   Peckham and White were partners in the Boston law firm of Bingham McCutchen.   Although White was working to protect the interests of Chang or her family, White had an attorney-client relationship with Foster, and Foster paid all of her fees.

51.   In furtherance of Chang's intended estate planning, on March 7, 2005, White sent an email to Peckham regarding "Transmutation of Separate Property and Revocation of Premarital Agreement."   White prepared a letter for Foster to sign.   In the letter, White applied California law to explain the consequences of changing separate property into community property and the consequences of revoking the

premarital agreement. These changes benefitted Chang and circumvented the estate plans made by Foster when he was competent. White and Chang knew that Foster did not have the mental capacity to understand the effect of the proposed changes or the ability to protect his own interests. White's letter was forwarded to Chang in California.

52.     In her March 7, 2005 email, White described further changes to Foster's estate that unjustly benefited the Chang Family. In particular, White stated that if Chang survived Foster, Sarah and Victoria Foster (residing in New York and Massachusetts, respectively) would each receive about $4 million in assets; whereas three of Chang's siblings (residing in New York, New Jersey, and Texas) would *each* receive $3 million in assets; Chang's five nieces and nephews (residing in New York, Virginia, Texas, and New Jersey) would receive 1/5 the value of the real estate in trust. White also noted that Foster would be asked to put an exemption amount in trust for Chang to minimize her taxes.

53.     White orchestrated the appointment of Chang as successor trustee of The Foster Family Marital Trust and Credit Trust in a series of amendments to the FFT. With White's counsel, Chang and Foster requested that Selzer – Foster's long-time California attorney – resign as Trustee. On May 12, 2005, Selzer resigned as trustee of the Marital Trust and Credit Trust. Foster appointed Peckham as successor co-trustee.

54. On May 16, 2005, Peckham resigned and, at White's direction, appointed Chang to succeed him as co-trustee of the Marital Trust and Credit Trust. On that same day, pursuant to White's advice, Foster and Chang also revoked their Premarital Agreement, executed a Third Amendment to the DAF Trust, and made other modifications to their estate. As a result of these modifications, Chang was now able to directly control all of Foster's assets in the Marital and Credit Trust.

55. Over the years, the 25,000 shares of Colgate-Palmolive stock purportedly in the DAF Trust grew to 120,000 shares. The growth was the result of stock splits and gifts of shares from Foster to Chang, which she purported to place in the DAF Trust. The stock was in the custody of the Merrill Lynch office in Palm Spring, California but was never re-titled as an asset of the DAF Trust. No tax identification number was ever obtained for the DAF Trust. The stock was consistently titled in the name of the FFT – Survivor's Trust and its income was reported on Foster's joint tax return.

56. The above notwithstanding, White considered the Survivor's Trust as being part of the DAF Trust. She counseled Chang and later Gomer and the co-executors (Kim and Yong Sam Chang) to treat the Survivor's Trust as being in the DAF Trust.

57. On September 19, 2006, White (Boston) sent a letter to Chang (New York City) enclosing Chang's "new will and revocable trust." White signed this letter "Your sister." White also enclosed a flow chart describing a new trust, which

was named "The Alexandra Chang Foster Revocable Trust – 2006."  According to the flow chart, upon Chang's death the Massachusetts property, the principal residence in Rancho Mirage, California, and the New York City residence – essentially all of Foster's real estate – would pass to Chang's siblings upon Chang's death.  The trust was executed on September 27, 2006.  On November 28, 2006, Chang amended the trust.  The amendment distributed $100,000 to Sheila White and $100,000 to Sarah White, Donna White's daughters.  Foster did not have any knowledge of Chang making this "gift" to White's daughters.

58.     In the fall of 2007, Chang was diagnosed with terminal cancer.

59.     In the wake of her diagnosis, Chang stepped up her efforts to divert Foster's assets to herself or to her family members.  On January 24, 2008, Chang (California) wrote to White (Boston) about the recent changes to her estate and acknowledged that "until now, I haven't had the energy or courage to discuss with [Foster]."  Chang closed the letter by stating:  "I trust you will use [your] utmost intelligent mind to execute the problems in our favor."  Chang also signed the letter:  "With much love / Your elder Sister / Alex."

60.     In a post-script to the letter, Chang further discussed the transfer of a Merrill Lynch investment account from Merrill Lynch's Palm Springs, California office to the San Francisco office.  Foster had maintained a relationship with the Merrill Lynch office in Palm Springs for over a decade.  Chang transferred the accounts to the San Francisco office over 350 miles from Foster's home.  In her letter

to White, Chang further noted that Merrill Lynch in San Francisco was transferring 20,000 shares of Colgate-Palmolive stock into the Marital Trust from the Survivor's Trust. Foster did not have capacity to consent to this transfer.

61.    On January 30, 2008, Gomer and White spoke about Chang's medical condition and last minute changes to one or more trusts over which Chang had control. On that same date, White called the Merrill Lynch office in San Francisco.

62.    Upon information and belief, Chang, Gomer and White were collaborating in an attempt to divert Foster's assets before Chang died.

**Chang's Death / Foster Falls Under Gomer's Control**

63.    On January 31, 2008, Chang died in California. Most of Chang's estate planning efforts assumed that she would out live Foster. At the time of her death, there were 120,000 shares of Colgate-Palmolive stock in the Foster Family Trust - Survivor's Trust and in the custody of Merrill Lynch San Francisco.

64.    After her sister's death, Gomer immediately flew from New Jersey to California. Upon her arrival in California, Gomer gathered all of the jewelry in Foster's California home and flew back with the jewelry to New York. In particular, Gomer absconded with Chang's engagement ring, which was worth approximately $250,000. Chang also sequestered other jewelry, Foster's war medals, and other valuables in a locked closet.

65.    Mary Axelrod (Foster's housekeeper in California) also reported that the Changs removed several boxes of items and papers from Foster's residence in

Rancho Mirage, California, including Chang's journals regarding her and Foster's financial affairs.

66.   Mary Axelrod informed Sarah Foster of Chang's death.   Sarah and Victoria Foster planned to travel from their homes in New York and Massachusetts (respectively) to California as quickly as possible.  Sarah Foster telephoned Foster. The telephone was answered by Gomer.    After Sarah Foster expressed her condolences, she informed Gomer that she and Victoria Foster would soon arrive in California.    Gomer reacted with surprise and did not understand why Foster's daughters were coming to California.

67.   Sarah Foster again telephoned her father in California, and again, Gomer answered the telephone.  Gomer informed Sarah Foster that she and other members of the Chang Family had decided to each spend a couple of weeks with Foster.  Sarah Foster expressed her gratitude but stated that she and Victoria Foster would provide for Foster's care.  Gomer objected, stating that she was going to care for Foster.  After Sarah Foster continued to assert that Foster's daughters were the proper parties to care for Foster, Gomer suggested that she add the Foster daughters to the "roster."

68.   Sarah and Victoria Foster arrived in California on February 3, 2008. Gomer instructed them "don't touch anything, the estate is not settled."  Sarah Foster further found the locked closet; the closet was usually open.  Sarah Foster informed her father, who asked Gomer for the key.  Gomer informed Foster that Yong Sam

Chang had taken the keys to New York City.  Gomer said the keys would be returned to California.

69.   Gomer then asked to speak privately with Victoria Foster.   Gomer wanted to know who would take care of Foster now that Chang was gone.  Victoria Foster said that she and Sarah Foster planned to stay with Foster and provide for his care.  Victoria Foster understood that Gomer planned to leave within a week of Chang's death.

70.   On February 4, 2008, Foster (with the assistance of Sarah and Victoria Foster) telephoned White and expressed concerns about the locked closet and Gomer's apparent effort to obtain possession of his family silver and other personal property.  Foster also asked several questions about his estate; White evaded Foster's questions.  Foster also expressed confusion as to why White did not answer his questions or call him back.  Foster placed the call from his California residence to White's office in Boston.

71.   On February 5, 2008, Foster's house keys arrived in California from New York City.  Gomer tried to divert the Federal Express package, but it was intercepted by Sarah Foster and given to Foster.  After locating a key to open the closet, Foster and Sarah Foster discovered their family silver, Foster's World War II medals, and other family heirlooms.  Gomer demanded that the Fosters not touch any of the items in the locked closet.  Sarah and Victoria Foster stated that the Foster

Family heirlooms and Foster's war medals had nothing to do with the Chang Family and that the Chang Family had no right to possess any of Foster's keys.

72.   On February 6, 2008, Sarah Foster travelled from California to her home in New York.  Before departing, Sarah Foster booked her return flight to California, believing that she and Victoria Foster would be caring for their father.

73.   On February 7, 2008, Mary Axelrod (California) telephoned Sarah Foster (New York) to report that Gomer was attempting to convince Foster to marry her.  Sarah and Victoria Foster made separate telephone calls to their father.  Foster was disoriented, but he did not indicate any intention to marry Gomer.

74.   Sarah Foster (New York) telephoned her father in California on February 9, 2008.  Gomer did not allow her to speak to her father.  Whenever Gomer answered a telephone call from Foster's daughters, she typically asserted that Foster was unavailable, and if she did provide the telephone to Foster, she stood close to him, whispering in his ear, coercing / coaching with her preferred response.  Sarah and Victoria Foster heard Gomer coaching / coercing Foster through many telephone calls.  Gomer also plied Foster with alcohol.  An employee reports that once Gomer left California the alcohol abuse ceased and with proper care Foster exhibited vastly improved energy and vitality.

75.   On February 11, 2008, Sarah Foster (New York) telephoned Foster's California physician, Dr. Robert Waterbor.  Sarah Foster expressed concern about Gomer's influence and asked about whether Foster should take a competency exam.