Dr. Waterbor stated that a competency exam could be given during Foster's regular check-up. Sarah Foster then called her father in California. Gomer answered the telephone and would not allow Sarah Foster to talk to Foster. Later in the day, Gomer caused Foster to telephone Sarah Foster. Pursuant to Gomer's coercing / coaching, Foster stated that she should not return to California. He further stated that he did not want Sarah Foster living with him and caring for him permanently and that he was not an invalid. Foster also professed his "love" for Gomer. Sarah Foster continued her efforts to communicate with her father.

76.     After Chang's death, Foster's household staff in California recognized that Foster frequently referred to Gomer by Chang's name. It was apparent to the staff that Foster thought that Gomer was his deceased wife, Chang. Gomer never corrected Foster's misapprehension.

77.     On February 15, 2008, Sarah Foster (New York) spoke to Foster (California) over the telephone. Foster stated that he loved Sarah Foster. Sarah Foster stated that she and Victoria Foster also loved him and that Gomer was taking advantage of Foster. Sarah Foster told Foster that the Chang Family had taken all of his documents and misdirected his property. Sarah Foster asked if Foster had spoken to his accountants in California. Foster stated that he had met with the accountants earlier that day, and they advised him to retain a good lawyer to protect his interests. Sarah Foster said that she would try to find a good lawyer. Foster apologized for

being cruel and said that he had many legal issues to review.  Foster thereafter met with his accountants.

78.    On February 21, 2008, Sarah Foster (New York) received a telephone call from Foster's accountants in California, who reported that they were very concerned about Gomer's undue influence over Foster.  Sarah Foster telephoned her father in California.

79.    Gomer (California) emailed White (Massachusetts) on February 25, 2008 stating that she "tried to impress upon [Foster] to not bother with a new team of counselors, and that his affairs should not be in any conflict with [Chang's] estate, nor with you as the one handling it."  Gomer further stated:  "I've also tried to point out to him the futility and possibly injurious nature of making a fuss about his wife's gift [of $200,000] to your children and the difficult spot that you're in.  I hope that my talk sobered him in this regard."

80.    Gomer had absolutely no authority to act or speak on behalf of Foster at this time.  Although she was purportedly Foster's attorney, White never contacted Foster directly and asked him whether Foster would benefit from new counsel, whether Gomer had authority to act or speak on Foster's behalf, whether there was any conflict between Foster's affairs and Chang's Estate, or whether Foster had any concerns about the $200,000 gifted by Chang to White's daughters.  White also never communicated with Foster's daughters.

81.   On February 28, 2008, White in Boston sent a letter to Foster in California, enclosing a DPOA, a health care directive, a Fourth Amendment to the DAFT, and a Seventh Amendment to the FFT.  White explained:

> You also asked that [Gomer] be named as the co-trustee of . . . [two FFT subtrusts].  In accordance with the terms of the trust document, the appointment of a co-trustee must be made by the [California] probate court. I will take the steps necessary to begin this process.

82.   On February 29, 2008, Gomer (California) and White (Massachusetts) exchanged correspondence about renewing the title on Chang's New York City apartment.

83.   Because Gomer apparently recognized or was advised by White that she lacked any authority to act on Foster's behalf, Gomer obtained Foster's DPOA.  In a March 3, 2008 email to White, Gomer stated that Foster "was initially upset about the power and authority granted by the DPOA but later acknowledged that it was necessary."

84.   On March 17, 2008, Foster executed a DPOA and health care proxy drafted by White at the behest of Gomer.  In the DPOA, Foster named Gomer as his agent.  Foster also appointed Gomer as co-trustee of the Survivor's Trust.  There was effectively no trustee of the Marital Trust or Credit Trust, as Chang was now dead and Foster was functionally incapacitated.  Foster executed the documents at the office of David Erwin, a California attorney.   Erwin witnessed the execution and

reported that Foster had a "worried look" while in the presence of Gomer, as if Foster feared her disapproval.

85.     White, Foster's purported attorney, never met with Foster outside the presence of Gomer to determine whether his execution of the DPOA and health care proxy was voluntary or to explain to Foster the potentially adverse ramifications of his actions.

86.     During March 2008, Victoria Foster (Massachusetts) telephoned Foster (California) and stated her intention to move to California.  Foster responded that he was "okay" and would see his daughter in New York City.

87.     On April 22, 2008, White (Boston) emailed Gomer (California) about Gomer's ability to control or take possession of Foster's real property upon his death: "my advice would be for [Foster] to set up a revocable trust that will hold title to NY, Rancho Mirage and Nantucket.  It will also contain the distribution to you of these assets at his death."   White never consulted with Foster as to whether he wished to bequeath his real property to Gomer, as opposed to his daughters.

88.     Five days later, Gomer (California) emailed White (Boston) regarding her effort to position herself as Foster's sole beneficiary (only three months after Chang's death): "I hope it doesn't come as a surprise to you. It is one that is natural, at least to me, considering the circumstances surrounding him and those around him. Nevertheless, from the legal and his daughters' standpoint, they may not see it that

way. I'm wondering then, what are possible legal ramifications and challenges that confront this situation?"

**Foster's Transfer to Nantucket**

89.    In May 2008, Gomer transferred Foster from California to Nantucket. Gomer now had Foster's DPOA, had assumed the role of Foster's overseer (if not wife, given Foster's confusion as to the whereabouts and fate of his actual wife, Chang), and was positioning herself to be Foster's sole heir. Gomer had achieved all of this from Foster's home in California with the aid, assistance, advice and counsel of White in Massachusetts. Gomer, however, had no intention of spending the summer on Nantucket as Foster's caregiver.

90.    In the summer of 2008, Gomer enlisted the assistance of Albert E. Siedman. Siedman, a resident of New York, moved to Nantucket to care for Foster. Siedman had no experience or education relating to healthcare or geriatric care. Under Gomer's direction, Siedman assumed control over Foster's staff.

91.    Throughout the summer of 2008, Siedman was in frequent telephone contact with Gomer. Multiple telephone calls between Siedman (in Massachusetts) and Gomer (in New Jersey) typically occurred each day. Siedman allowed no one to overhear the conversations.

92.    Meanwhile, Gomer continued to financially abuse Foster. On May 1, 2008, Gomer (New Jersey) wrote to White (Massachusetts) about "simplifying" Foster's finances "by consolidating various accounts." Gomer reported that she was

working with Merrill Lynch in California "to have all of the dividends swept into one account" at JP Morgan in New York.  Gomer further indicated plans to do the same thing with Foster's Wells Fargo account in California, which handled Foster's pension and Social Security.  Gomer asked for White's "green light."  White responded by saying:  "I think your consolidation idea is sound and that you should move forward."

93.  On May 9, 2008, Gomer and Foster travelled from Massachusetts to New York City to meet with White at the law office of a colleague.  Gomer and White caused Foster to execute a will, trust, and various trust amendments that effectively installed Gomer as Foster's fiduciary and named Gomer as sole beneficiary of almost the entirety of Foster's estate.  Once again, White never met with her client, Foster, outside the presence of Gomer to determine whether Foster was acting voluntarily or was competent to sign the documents.  White further failed to explain to Foster the potentially adverse ramifications of his actions.

94.  Prior to his birthday on May 24, 2008, Sarah Foster (New York) telephoned Foster (Massachusetts) to see how Foster was doing and to see what his birthday plans were.  Gomer would not allow Sarah Foster to speak to her father, falsely saying that he was busy.

95.  Of the three trusts that held the bulk of Foster's assets, only the terms of the Credit Trust (which provided benefits to his daughters) could not be altered by Foster.  He had the authority to alter the terms of the Survivor's Trust, and he could

direct the corpus of the Marital Trust upon his death.  Although the Credit Trust was beyond Foster's ability to alter, Gomer still sought to control the assets of that trust. On May 30, 2008, Gomer in New Jersey wrote to White in Boston:

> [Foster] and I have finally decided to sell half of the survivors trust to make ready for Alex's estate distribution. . . .
>
> . . . [Foster is] still staggered by the idea of losing half of the survivors trust to beneficiaries, but he is even more upset by the idea of his daughters getting nearly a million while he still lives and who are hardly involved in his life, along with the fact that he can't even afford to get a bigger place in NYC when all this is over and done with.  Looking at his financial status with this backdrop, he believes that the provisions of the credit trust for his daughters are too excessive and unnecessary and the portion should be reduced to at least by half. So, he has asked you, if possible, to transfer half of the credit trust, 20,000 shares of Colgate, to be precise, to the survivors trust. . . .
>
> I don't mean to overloads [sic] you, but additional things on the to-do list include putting in place, of measures to minimize [Foster's] estate burdens when the time eventually comes, as well as establishing a firm legal basis to stave off the inevitable challenges of provisions

that [Foster] had put in place for me. I act as [Foster's] mouthpiece when I speak of these matters, for he worries about these things, while referring [sic] you as one who could try to help him to accomplish his objectives. . . .

Once again, White did nothing to confirm that Gomer's instructions reflected Foster's intentions or that Foster was competent to make such decisions. White made no effort to contact Foster's daughters. Gomer also misrepresented Foster's intentions, statements, and plans.

96.   Victoria Foster called her father on June 3, 2008 to ask whether she could visit him on Nantucket. Foster returned her call the next day and, pursuant to Gomer's coaching / coercing, falsely stated there was not enough room in his house for her.

97.   On June 23, 2008, Gomer further wrote to White about a letter she "constructed" on behalf of Foster. Gomer included the language of her letter:

To whom it may concern,

The purposes of this statement are to dispell [sic] any doubts and concerns in anyone's mind of the intent of my last will and testament and to prevent any attempts by my daughters, Sarah and Vicky Foster, or anybody else, to challenge or to overthrow the wishes expressed in my last will and testament.

My decision to designate my sister-in-law Aggie, known as Aehui C. Gomer, as the sole beneficiary of all of my properties, both physical and nonphysical, was one that was reached as a result of both my love and affection for Aggie and my appreciation for her role in my life, which became vital and necessary since the passing of my wife, Alexandra Foster.   Some may question my decision to bequeath my estate to Aggie as an unnatural one, as I have two living daughters who, in normal circumstances, might have been named my beneficiaries.   However, my relationship with both of my daughters, Sarah and Vicky Foster, which has long been difficult and strained, and their disinterest and noninvolvement in my life, precluded them as the beneficiaries of my estate.

I remain content that the futures of the daughters will be adequately provided for through a trust known as the Credit Trust.

I reached the decisions stated in this letter without influence from anyone, including Aggie and I write this letter of my own accord.

98.     Gomer and her daughter constructed various versions of the letter and forced Foster to copy the letter in his own feeble hand-writing.

99.     White knew the statements in this letter were false and, in particular, knew that the letter falsely represented that it was written by Foster.   Gomer and White intended for this letter to be held in White's file and to be presented to the

Foster daughter's as evidence of Foster's intent if they challenged the distribution of his estate after his death.

100.   According to Jessie Jorquera (Foster's housekeeper and care-provider on Nantucket), Foster appeared scared, worried, and sad when Gomer forced him to write the letter.

101.   Gomer, however, was not content with a mere letter purportedly penned by Foster and explaining why he decided to leave all of his assets to his former sister-in-law, rather than his own daughters.  On June 23, 2008, Gomer (New Jersey) emailed White (Massachusetts) about her insecurities:

> [Foster's] not terribly well, and it was kind of a struggle for him to write the letter. . . .  I've been thinking about the will and the letter, and how effective these documents will be when it comes to crunch time, and if they will have any legs to stand on when challenged.  [Chang], at one time, was anxious about her right of survivorship, despite being [Foster's] spouse.  This makes me think about my position as being highly vulnerable to challenges. . . . .  So, I would like to explore concrete measures that would preemty [sic] or obviate any legal challenges in the future.  One option I was thinking of was a transfer of [Foster's] assets to my name before anything happens.  If this were to be feasible, what consequences are there?  What other

options can we consider?  Anyway, I'd like to really pursue along this line before too long.

102.   On July 16, 2008, Gomer sought to further solidify her position by marrying Foster.  At the time, Foster was under Siedman's care, was rarely allowed to leave his room, was maintained in a state of inebriation, and (by all accounts) still believed that Gomer was Chang.  Gomer did nothing to remedy Foster's confusion. Gomer emailed White:

> [Foster] has asked me to marry him.  I realize that my decision is strictly personal, I still wonder what the implications would be in terms of [Foster's] wishes for me if I were to marry him.  Will it help me or hurt me?  Regardless of the legal ramifications, I ponder this proposal with great trepidations.

At the time, upon information and belief, Gomer was still married to her husband in New Jersey.

103.   Although White had not met privately with her client, Foster, since Gomer assumed control of his life, White responded to Gomer's July 16, 2008 correspondence: "I am not surprised about the proposal.  As you say it is a personal decision.   On the legal side, the assets will pass to you tax free eliminating a substantial burden.  I can't see that it would hurt you on the legal side and may very well help you."  White offered no opinion as to whether Gomer's plan would help or hurt Foster or his rightful heirs.

104.   On July 22, 2008, Victoria Foster received a call from Foster.  He asked Victoria Foster how she and Sarah Foster were doing and said that he loved them very much.  Shortly thereafter, Victoria Foster received a voicemail message from Foster, asking her to come to Nantucket in August.

**Unauthorized Administration of Chang's estate to Foster's detriment**

105.   Simultaneous to this time period, White, Gomer and the named co-executors (Kim and Yong Sam Chang) were actively managing the administration of Chang's estate, which was to be probated in California.  During this time none of the aforementioned individuals had legal authority to manage Chang's estate.

106.   Nonetheless, in July 2008, the co-executors distributed $405,000 worth of Chang's jewelry taken from Foster's home in California to various members of the Chang Family on the East Coast.  The co-executors purportedly gave the two most valuable pieces of Chang's jewelry (worth $306,000) to Foster.  In October 2008, Gomer falsely reported to White that Foster gifted the jewelry back to her.

107.   Gomer, Yong Sam Chang, and Kim's claim that they gave $306,000 worth of jewelry to Foster is false.  Upon information and belief, none of Chang's jewelry was ever in the possession or control of Foster after Chang's death but was consistently in the possession and control of Gomer, Yong Sam Chang, and/or Kim.  In April 2009, Yong Sam Chang and Kim also filed a fraudulent Form 706 Estate Tax Return stating that the jewelry was given to Foster.  By this maneuver, Yong

Sam Chang and Kim managed to reduce Chang's taxable estate and exposed Foster to gift tax liability.

108.   Gomer, with White's advice and consent, fraudulently induced and coerced Foster to agree to sell 30,000 shares of his Colgate-Palmolive stock (in the custody of Merrill Lynch, San Francisco) to pay Chang's estate tax.

109.   On June 30, August 5 and September 15, 2008, White and Gomer caused three sales of Colgate-Palmolive stock in the amount of 10,000 shares each and in the custody of Merrill Lynch, San Francisco. The 1099 that issued was in the name of the Foster Family Trust - Survivor's Trust.  Yong Sam Chang and Kim knew of these transactions and the application of the sale proceeds to Chang's estate tax.  Yong Sam Chang and Kim conspired with Gomer in her capacity as agent under a DPOA and or as Trustee of the Foster Family Trust - Survivor's Trust to cause the stock to be sold, resulting in Foster's loss of approximately $2.4 million and substantial gift tax exposure.

110.   In July and August 2008, White worked with Hilary Pierce, White's law partner in California, to name Gomer as trustee of the Foster Family Trust – Martial Trust and Credit Trust. Gomer was already trustee of the Foster Family Trust – Survivor's Trust.  White further informed Pierce that Foster wanted to place his principal residence in Rancho Mirage, California in his revocable trust.  Gomer was the sole beneficiary of that trust.

**Elder Services of Cape Cod Intervenes**

111.   In August 2008, Elder Services of Cape Cod ("ESCC") began an investigation relating to Foster's care.   Upon information and belief, this investigation was prompted by a call to ESCC placed by Foster's visiting nurse. Gomer informed White that ESCC was investigating a report of financial abuse and was concerned that "unusually large charges of liquor" were made in Foster's name.

112.   Sarah Foster telephoned her father on August 19, 2008.   Gomer's daughter, Sophie Gomer, answered the telephone.   Foster was allowed only to speak on the speakerphone in the presence of Gomer and her daughter.   The next day, Gomer telephoned Sarah Foster and falsely stated that Foster had a "cold" and "a stomach problem."  She instructed Sarah Foster not to call or visit Foster.

113.   On August 20, 2008, Sarah Foster received a check at her home in New York from Foster.   The check was executed by Gomer in New Jersey.   For the first time, Sarah Foster was aware of the DPOA purportedly given to Gomer by Foster.

114.   On August 24, 2008, Sarah Foster (New York) telephoned Foster (Massachusetts).   Gomer answered and put Foster on the line.   Sarah Foster could hear Gomer coercing / coaching Foster as he told Sarah Foster: "stop meddling in my life."  Foster also asserted that he could drink wine anytime he wanted and that he did not want to see Sarah Foster.

115.   Rather than encouraging the intervention of ESCC to determine whether Gomer and Siedman were acting in the best interest of her client, Foster, White

emailed Gomer on August 26, 2008: "I am trying to get some answers for you on your rights and the rights of the Elder Services group. I will email as soon as I have it sorted out." Without talking to Foster, White advised Gomer "to have [Foster] call the person back and tell them he does not wish to meet with them before he has had an opportunity to review the matter with his attorneys." White made no effort to schedule a meeting between herself (or any other attorney) and Foster and relied only on the information provided by Gomer.

116. On August 28, 2008, Gomer wrote to Sarah and Victoria Foster, abruptly announcing her intention to abandon her self-assumed role as Foster's overseer:

> . . . For nearly eight months now, I've cared for your father, but [sic] time has come to pick up my own life. I believe that your father has regained his emotional stability, and has come to accept the new chapter in his life. Thus, I believe that this is the right juncture in which to make a transition for me and your father into a life that is humane and constructive for all concerned.

> * * * *

> Reasons for my decision to pare my part in your father's care are multifold, not [sic] least of which is to make way for you and your father to come together, but also to attend to my long-postponed personal and familial exigencies and to resume my life as I left it. I

believe that putting your father in your care is an option that is not only natural but one that is positive for all concerned.  And to which I hope you agree.

117.   Gomer's letter was false.  She had no intention of allowing the Foster daughters to care for Foster.  The purpose of the letter was to lull the Foster daughters into a belief that Gomer's influence over Foster was soon ending and to delay further action by ESCC or Foster's Family.

118.   On September 2, 2008, Victoria Foster received Gomer's letter.  She immediately telephoned her father on Nantucket and said she would come to take care of him.  Gomer said that she was leaving Nantucket and that they could meet when she returned.

119.   On or about September 3, 2008, Victoria Foster met with Gomer and Siedman.  Gomer falsely informed Victoria Foster that she wanted to get back to her "life" and thought it was time for Victoria and Sarah Foster to care for Foster.  Victoria Foster said that she and Sarah Foster wanted to care for Foster since Chang died, but Gomer would not allow it.  Victoria Foster asked Gomer whether she had informed Foster of her "resignation."  Gomer said that Foster did not know about the letter.  Siedman opined that Foster needed "special" care or needed to live in an assisted-living facility.  Victoria Foster stated that Foster would not be placed in an

assisted-living facility.   Foster had often expressed his desire to not end up in a

nursing facility and had ample resources to employ professional care in his home.

120.   On September 3, 2008, White caused her law partner, James Lawson, to

intervene and contact Pam Volmes of ESCC.   White subsequently informed Gomer

that "the matter is now closed" thus postponing Foster's rescue to a later date.

121.   On September 9, 2008, Foster left a message with Victoria Foster,

stating that if she wanted to come to Nantucket to visit, that was fine, but he did not

need help, he could take care of himself.   Gomer further falsely stated that there were

no rooms available for Victoria Foster.   Foster's statements to Victoria Foster were

false and coached / coerced by Gomer.

122.   On September 10, 2008, Sarah Foster emailed Jessy Jorquera, Foster's

former caregiver on Nantucket, to ask whether she would be interested in providing

short-term care for Foster if Gomer and Siedman exited his life.

123.   Jorquera responded, stating her belief that Gomer was simply "playing a

game" when she sent her resignation letter on August 28 in an effort to convince

Foster to move to New York City.   Jorquera refused to work any further for Gomer

but was happy to provide care if Gomer was gone.   Jorquera said that she recently

overheard Gomer and her siblings discussing the value of Foster's property.

Jorquera also stated that Gomer "has poisoned your daddy against you."   Jorquera

further disclosed a conversation with Foster, during which he told Jorquera that

Gomer loved him and that Gomer "has relations with him." Upon information and belief, Gomer was (at the time) still married to her husband.

124. From September 10 to September 16, 2008, Victoria Foster visited her father on Nantucket. Foster was very happy to see her. Foster apologized for the message he left the day before. Victoria Foster sensed that Gomer was listening and went into the next room to find Gomer around the corner. Gomer rushed away. Foster looked worried but told Victoria Foster that he did not want his daughters living with him or caring for him.

125. Foster's physical and mental health declined in the fall of 2008. Gomer moved Foster to an assisted-living facility on Nantucket, rather than to California or New York City where superior health care was available.

126. In October 2008, Foster fell in his home and was taken to Nantucket Cottage Hospital. Foster was soon moved to an assisted-living facility, Sherbourne Commons for rehabilitation.

127. Sarah Foster seldom spoke to Foster about his finances. In the fall of 2008, however, Sarah Foster began to broach the topic of Foster's finances. During the discussions between Sarah Foster and Foster, Foster was surprised to learn that he had given Gomer power of attorney and that she controlled all of his property. Foster was also upset when he found out that Sarah and Victoria Foster had been eliminated from his estate.

128.   Gomer continued with her efforts to obtain possession of Foster's assets with the assistance of White.   On October 13, 2008, Gomer (New Jersey) and White (Massachusetts) exchanged emails regarding Gomer's plans to sell Foster's California home.   Three days later, White emailed Gomer about the liquidation of Colgate-Palmolive shares from the Survivor's Trust, in the custody of Merrill Lynch, San Francisco. White noted: "[w]e will need the liquid funds to pay the tax with the extension to file [Chang's] estate tax return.  I know that at least 20,000 had been sold."   In effect, White assisted Gomer's effort to place the burden of paying Chang's estate tax on Foster's personal assets, rather than the Chang's assets.

129.   On October 19, 2008, Sarah Foster received an email from Jorquera, who stated that she was surprised and sorry to hear that Foster was in an assisted-living facility.  Jorquera further disclosed: "I know that he lived all these years afraid to go to one of [those] places, because every day like his vitamins, [Chang] told him that if she left him, Vicky and you would leave him in a home."

130.   Sarah Foster telephoned Sherbourne Commons and discovered that Foster had again been admitted to the hospital.

131.   With the guidance of White, Gomer managed the 120,000 shares of Colgate Palmolive stock in the Foster Family Trust – Survivor's Trust, as if the shares were in the DAF Trust.  Gomer created a new Merrill Lynch account in Foster's name and funded the account with 60,000 shares of Colgate-Palmolive stock. Of the emaining 60,000 shares in the Survivor's Trust, which was purportedly

bequeathed to the 6 beneficiaries, Gomer sold 30,000 shares and used $1.6 million of the proceeds to pay Chang's estate tax.  Until sold by Gomer, all of Foster's Colgate-Palmolive shares were in the custody of Merrill Lynch, San Francisco.

132.  On October 24, 2008, Gomer (New Jersey) emailed White (Massachusetts), informing her that the Survivor's Trust contained over $2 million in cash and 30,000 shares of Colgate-Palmolive stock.  Gomer further stated that Merrill Lynch, San Francisco needed a letter of authorization to pay Chang's estate taxes.  A day later, Gomer said that she would authorize $1,885,000 to be wired from the Survivor's Trust at Merrill Lynch – San Francisco to the trust account of White's law firm in Boston, Massachusetts.  At the time, Gomer and Foster were co-trustees of the Survivor's Trust and Gomer was Successor Trustee of the DAF Trust.  Foster had also given Gomer his DPOA.  Gomer's actions were in breach of the fiduciary duties she owed to Foster.

133.  The co-executors (Yong Sam Chang and Kim) knew that Chang's estate taxes were wrongfully paid by the proceeds of the sale of Foster's Colgate-Palmolive stock.

134.  Gomer also informed White that Foster's health was failing and that he was being moved out of assisted-living and back to his house on Nantucket.

135.  On October 25, 2008, Sarah Foster (New York) received a voice mail message from Gomer (New Jersey), stating that she had convinced Foster to sell his home in California and that she was moving him from Nantucket to New York City.

136.  On October 26-27, 2008, Sarah Foster visited Nantucket but was not allowed by Gomer and Siedman to stay in Foster's home.  She visited Foster in the hospital.

137.  By October 28, 2008, an issue had arisen regarding the value of Chang's jewelry and its impact on the estate taxes owed.  White (Massachusetts) asked Gomer (New Jersey) about the value of the jewelry she took from Foster's home in California.  Gomer falsely explained: "the family had decided to return the two pieces back to [Foster], as an expression of their gratitudes [sic] of his being the ultimate benefactor to them."   According to Gomer, Foster thereafter gifted the pieces back to Gomer in July of 2008, as a token of his affection and gratitude to Gomer's services to him.  White used this knowingly false information provided by Gomer to calculate Chang's estate tax.

138.  On October 28, 2008, Gomer also signed an extension to file the estate taxes of Chang.  Chang signed the extension as a "person in possession."  Gomer never held any fiduciary capacity relative to Chang's estate.  Typically, such an extension would be signed by the co-executors, Yong Sam Chang and Kim.

139.  Foster was discharged from the hospital and returned to his home on October 29, 2008.

140.  On November 9, 2008, Sarah and Victoria Foster telephoned Foster to tell him that they planned to visit soon.  Gomer responded by leaving a message, falsely saying the house was full and there was no room for Foster's daughters.

141.   Chang's will was filed in Riverside County, California on November 24, 2008, 10 months after her death.  Although she had no legal authority to do so, Gomer acted and White treated her as a defacto executor of the will throughout the ten months that passed since Chang's death.

142.   On December 5, 2008, ESCC received a second protective report of financial and medical abuse from Allison McKay, a visiting nurse in Foster's home. The report stated that Siedman falsely told Foster that his daughters were not on good terms with him.  The report also questioned whether Siedman, a real estate broker, was trying to profit from the anticipated sale of Foster's real estate.

143.   McKay's report prompted an in-home visit by Pamela Volmes ("Volmes"), a protective service caseworker for ESCC, on December 8, 2008. Siedman insisted that he must be present while Volmes spoke to Foster and interrupted the interview several times.  White again caused a colleague to contact ESCC in an effort to thwart its investigation.

144.   The intervention of ESCC prompted Gomer to increase her efforts to transfer Foster's property to her control.  On or about this time, Gomer and Siedman had presented a letter to Foster regarding Gomer's plan to sell Foster's homes in California and his apartment in New York City.  Foster expressed concern.   The next day, Foster telephoned Gomer in New Jersey with Siedman's assistance.  Foster told Gomer:  "don't sell anything, I want to go to California!"  Gomer was so upset

that she hung up the telephone.  After the call, Siedman asked a caregiver to leave the room and spent the day trying to persuade Foster to sell his homes.

145.  Foster's resistance caused Gomer to appeal to White.  On December 11, 2008, Gomer in New Jersey emailed White in Massachusetts, stating that Foster "isn't sure about selling his houses."  Gomer also reported on the recent intervention by ESCC.  According to Gomer, Volmes "barged into the house and talked" to Foster.  Gomer further stated:

> It's clear that the person who's making the reports are [sic] set on discrediting his mental capacity to imply that he can be manipulated and exploited by those who care for him.  I'm pondering what should be done about [Foster's] situation.  Clearly, there are people out there who want to see changes in [Foster's] business.  I'm mulling over what should be done.

146.  During Christmas of 2008, Sarah and Victoria Foster spent time alone with their father.  Gomer did not come to Nantucket for the holiday, and Siedman departed the day before Christmas.  Foster told his daughters that he wanted to go to California but thought he needed permission from Gomer or Siedman.  Sarah and Victoria Foster explained that he could go anytime but that Gomer had his money.  Foster expressed surprise that Gomer had control of his money and said: "we'll have to fix that."  Sarah Foster also explained that Gomer could sell the California property whenever she wanted.  Sarah and Victoria Foster explained that Siedman was simply cooking Foster's food and had no control over him.

147.  On December 29, 2008, Foster spoke to Volmes over the telephone. Foster was concerned about any financial improprieties that took place and requested that Volmes look into the matter.  Volmes visited Foster the next day.  Volmes reported that Foster was "very confused and was unable to answer most of the questions" that she asked.  Volmes spoke to Foster's caregivers.  According to the caregivers, Siedman told them to "just lock [Foster] in his room" at night.  Sarah Foster requested that ESCC protect Foster by commencing a guardianship proceeding.

148.  On January 2, 2009, the pipes in Foster's Nantucket house froze and the sewer backed up.  Gomer and Siedman took this opportunity to telephone Foster and inform him that they were moving him to New York or New Jersey (where Gomer resided).  Foster objected, stating to Gomer: "what you've done wrong we're gonna do right! You and [Siedman] have been stealing from me."  Gomer then threatened to burn down Foster's Nantucket home.  Gomer told one of Foster's caregivers: "Mr. Foster has accused me and [Siedman] of stealing, he can sit in his s*** for all I care, he can wipe his a** himself, I don't care what he wants to do!"

149.  The hostile exchanges between Gomer and Foster caused Volmes to intervene again.  Foster told Volmes that he did not want to leave Nantucket.  Gomer continued to assert to Volmes that Foster needed to be transferred to New York or New Jersey.  After speaking to Gomer, Volmes reported to the Nantucket police that Gomer or Siedman should not be allowed to remove Foster from Nantucket against