his will.  As a precautionary measure, Foster was moved to an undisclosed location on Nantucket.

150.  On January 7, 2009, Volmes spoke to Gomer by telephone.  Gomer falsely claimed that, although she had Foster's DPOA, she could not pay for Foster's plumbing repairs or care because Foster's daughters had frozen his accounts.  ESCC contacted Wells Fargo in California and was informed that Foster's accounts were not frozen.  Gomer's lawyer also confirmed that Foster's accounts at Merrill Lynch, San Francisco were not frozen.  ESCC discovered that Gomer was signing Foster's checks pursuant Foster's DPOA to Gomer.  In prior communications with Volmes, Gomer had falsely claimed that she did not sign checks on behalf of Foster.

151.  Stephanie Wuebbens, a psychologist at Nantucket Behavioral Health, reported that she would sign a certificate, indicating that Foster was in need of guardianship because he could not manage his finances or health care decisions.

152.  On January 15, 2009, Sarah and Victoria Foster petitioned the Nantucket Probate Court for guardianship of their father.  The court appointed Marie C. Vaccarelli, Esq. as Guardian Ad Litem ("GAL") to investigate and report on issues relating to whether Foster was competent to execute the DPOA and healthcare proxy dated March 17, 2008.  The next day, Julie Fitzgerald, Esq. was appointed temporary guardian of Foster's person.

153.  As part of the guardianship proceeding, Gomer was ordered to render a full accounting for the financial activity during her tenure as agent for Foster under

the DPOA.  Gomer did not render such an accounting or otherwise comply with that order.

154.   The GAL visited Foster for the first time on February 7, 2009.  The GAL reported:  "It was clear that [Foster] knew that his money was not in his control, but in the hands of Ms. Gomer.  He seemed distraught over this. . . .  [H]e does not want Ms. Gomer handling his money at all. . . .  By his own account, Mr. Foster also regrets that Ms. Gomer frustrated his relationship with his own daughters when they tried to assist him after [Chang's] death."   The GAL further stated that Gomer and Siedman "exhibited to the [GAL] a profound inability to see beyond what they determined was best for Mr. Foster."

155.   On February 20, 2009, ESCC issued a report recommending that Gomer be relieved of her self-assumed duties relating to the handling of Foster's care and finances as soon as possible.

156.   The actions of Foster's daughters, the GAL, and ESCC caused Gomer to resign as Foster's agent under the DPOA and as trustee of Foster's various trusts on March 12, 2009.  After meeting with Foster, the GAL reported that Foster was "pleased to learn that progress had been made and delighted that Ms. Gomer was no longer in charge of his affairs.  Clearly this has remained a worry for him."

157.   On March 26, 2009, the Nantucket Probate Court stuck provisions of Foster's will and the 2008 Revocable Trust.  The provisions stricken had directed

that the balance of the Marital and Survivor's Trust be distributed to Gomer and had appointed Gomer as executor of Foster's will.

158. The GAL filed a report with the court on April 9, 2009. The GAL's report noted that White renounced the $200,000 bequest made by Chang to White's daughters. The GAL's report further noted: "It is clear that Mr. Foster continues to take comfort in knowing that Ms. Gomer and Mr. Siedman are well removed not only from his affairs, but from his life. He also seems to be genuinely enjoying the love, affection and companionship of his daughters, who also seem to delight in caring for him."

159. On or about April 28, 2009, Yong Sam Chang and Sung Hui Kim signed a United States Estate Tax Return (Form 706) as co-executors of the Estate of Chang. Schedule F of the Form 706 falsely represented that $306,173 in jewelry had passed from Chang to Foster.   In fact, Gomer took the jewelry from Foster's California home shortly after Chang's death, and upon information and belief, the jewelry was never in Foster's possession after Chang's death.  The false Form 706 was transmitted to the U.S. Department of Treasury by mail or interstate wires. Upon information and belief, Yong Sam Chang and Kim submitted the false Form 706 at the direction of Gomer and/or White.

160. Once Foster was freed of the deception and truly shameful care he received at the hands of Gomer and Seidman, he was able to enjoy several months of peaceful existence at his home on Nantucket with the care and companionship of his

daughters. On June 4, 2010, Foster died. He was over 90 years old at the time of his death. Foster's estate was also filed for probate in Riverside County, California.

161. In October 2010, Gomer and Yong Sam Chang executed a petition for an order instructing the trustee of the DAF Trust to marshal and distribute 50 percent of the Colgate-Palmolive stock held in the Survivor's Trust. The petition states that 50 percent of the stock equates to 50,000 shares. The petition was filed in the Superior Court of the State of California (Riverside County) on December 21, 2010. Upon information and belief, this petition was mailed and/or transmitted by wire between Gomer (in Jersey) and Yong Sam Chang (New York) and their attorneys in Los Angeles, California.

162. The petition states (among other things) that the DAF Trust holds 100,000 shares of Colgate-Palmolive stock, that Gomer, Yong Sam Chang, and four other beneficiaries of the DAF Trust are entitled to receive 50,000 of the Colgate-Palmolive shares (valued at $3,799,250), and "that a portion of said 50,000 shares may have been sold to pay the estate, inheritance or other death taxes" attributable to Chang's Estate. At the time of executing and filing the petition, Gomer and Yong Sam Chang knew these statements (among others) were false in that Gomer personally caused 30,000 shares of Colgate-Palmolive stock to be sold in October 2008 to pay for Chang's estate taxes and Yong Sam Chang, as a co-executor of Chang's Estate, signed Chang's United States Estate Tax Return (Form 706).

## Mail & Wire Fraud

163. After Foster became mentally incapacitated, Chang and White (and their co-conspirators) engaged in a scheme to unlawfully transfer Foster's assets to herself or to other members of her family. After Chang's death, Gomer and White (and their co-conspirators) further engaged in a scheme to defraud Foster of money and property. Gomer and White (and their co-conspirators) knowingly devised or knowingly participated in a scheme or artifice to defraud Foster or to obtain the money or property of Foster by means of false or fraudulent pretenses, representations, or promises.

164. Gomer and White (and their co-conspirators) could foresee that the U.S. Postal Service and interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. §§ 1341 and 1343.

165. In particular, Gomer and White (and their co-conspirators) knew or could foresee that the U.S. Postal Service and interstate wires would be used to receive and/or deliver, *inter alia*, communications between Gomer and White (and their co-conspirators) for the purpose of planning and preparing documents to facilitate the fraudulent transfer of Foster's personal property located in California, New York, and Massachusetts; information, documents, and materials related to the sale or liquidation of Foster's real property located in California, New York, and Massachusetts; documents and instructions concerning the DPOA wrongfully obtained by Gomer to facilitate the fraud upon Foster; instructions and updates between Gomer and Siedman

relating to the daily activities and care of Foster on Nantucket; false information to Foster's daughters and ESCC, preventing or delaying the discovery of the financial abuse of Foster; communications from White to Foster, falsely representing to Foster that transactions were in his interest when, in fact, the transactions were not in Foster's interest; threats and fraudulent statements designed to manipulate Foster and to cause him to take actions that were against his economic interests; invoices from White in Massachusetts to Foster in California, intending to defraud Foster of money; Schedule F of the Form 706, which falsely represented that $306,173 in jewelry had passed from Chang to Foster; and the false petition filed in Riverside County, California Probate Court on December 21, 2010.

166.   Gomer and White (and their co-conspirators) acting singly and in concert, personally or through their agents, used the U.S. Postal Service and interstate wires or caused the U.S. Postal Service or interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud Foster, within the meaning of 18 U.S.C. §§ 1341 and 1343.

167.   It is not possible for Foster to plead with particularity all instances of mail and wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications are within the exclusive control and within the exclusive knowledge of Gomer and White (and their co-conspirators) other presently unknown individuals.

168. By way of example, however, Gomer and White (and their co-conspirators) specifically used the U.S. Postal Service or interstate wires or caused the U.S. Postal Service or interstate wires to deliver each and every telephone call, email, and letter described in paragraphs 32 through 162 (*supra*), including but not limited to those further described below, for the purpose of advancing, furthering, executing, and concealing the scheme to defraud Foster:

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| Telephone | 01/30/08 | Gomer NJ | White MA | Gomer and White spoke about Chang's medical condition and last minute changes to one or more Foster trusts over which Chang had control. |
| Telephone | 02/04/08 | Foster CA | White MA | White evaded Foster's questions regarding Gomer's efforts to take possession of his property by locking it in a closet in an effort to advance and conceal Gomer's fraud. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| Telephone | 02/09/08 | S. Foster NY | Gomer CA | Gomer made false representations regarding Foster's availability and acted to conceal her fraud by not allowing Sarah Foster to speak to her father. |
| Telephone | 02/11/08 | S. Foster NY | Gomer CA | Gomer falsely represented that Foster was unavailable in an effort to advance and conceal her fraud and to isolate Foster. |
| Telephone | 02/11/08 | Gomer CA | S. Foster NY | Gomer coerced Foster and manipulated his diminished mental capacity to cause him to instruct Sarah Foster not to come to CA and to falsely say that he did not want the support of his daughters. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| Email | 02/25/08 | Gomer CA | White MA | Gomer and White strategized about concealing their scheme to defraud Foster. |
| U.S. Mail | 02/28/08 | White MA | Foster CA | White forwarded a DPOA, health care directive, the fourth amended to the DAF Trust, and the seventh amendment to the FFT, all governed by CA law and executed by Foster in CA. The documents were intended to facilitate Defendants' scheme to defraud Foster. |
| Email | 02/29/08 | Gomer CA | White MA | Gomer sought White's assistance in titling Chang's NY apartment to Gomer. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| U.S. Mail | 03/24/08 | Erwin CA | White MA | Foster's CA counsel asks White whether she's come to any conclusion regarding the community assets in CA. |
| Email | 04/11/08 | White MA | Gomer CA | With regard to the payment of bills for Chang's estate, White advises that the Changs borrow money from Chang's trust, held by Merrill Lynch in CA. |
| Email | 04/22/08 | White MA | Gomer CA | White advises Gomer to set up a revocable trust that will hold title to Foster's NY, CA, and MA property, which would facilitate the scheme to fraudulently obtain Foster's real property after his death. |
| Type of Communication | Date | From | To | Purpose |

| Email | 04/27/08 | Gomer CA | White MA | Gomer sought advice relating to possible challenges from Foster's daughters and to make it appear that her role as sole beneficiary of Foster's Estate was legitimate. |
|---|---|---|---|---|
| Email | 05/01/08 | Gomer NJ | White MA | Gomer sought White's approval to simplify Foster's finances by consolidating various accounts, which would in turn simplify Gomer's fraud upon Foster. |
| Email | 05/01/08 | White MA | Gomer NJ | White stated that Gomer's plan to consolidate Foster's accounts "is sound," and she should "move forward." White's advice furthered Gomer's fraud. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| Telephone | 05/24/08 | S. Foster NY | Gomer MA | Gomer falsely stated that Foster was busy and refused to allow Sarah Foster to speak with Foster, further concealing Gomer's scheme to defraud Foster. |
| Mail | 05/30/08 | Gomer MA | White MA | Gomer discussed plans to sell half the Survivor's Trust and to reorganize the Credit Trust; the letter is also concerned with challenges that may be brought by the Foster daughters after Foster's death. This exchange sought advice on how to advance and conceal Gomer's fraud. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| Email | 06/23/08 | Gomer MA | White MA | Gomer forwarded a letter that she "constructed" for Foster; the letter falsely purports to be Foster's explanation as to why he chose Gomer to be his sole beneficiary. |
| Email | 06/23/08 | Gomer MA | White MA | Gomer sought advice from White regarding whether she should cause Foster to transfer all of his assets to her before he dies and the potential legal consequences of such action. This exchange sought to advice on how to advance and conceal Gomer's fraud. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| Telephone | 06/30/08 | Gomer / Foster MA | S. Foster NY | Gomer caused Foster to instruct S. Foster not to visit and to falsely represent that the house was full; these actions were designed to advance and conceal Gomer's fraud. |
| U.S. Mail | 07/03/08 | White MA | Pierce CA | White asks her law partner in CA to assist with transferring Foster's CA property to a revocable trust and with installing Gomer as a co-trustee. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| Email | 07/16/08 | Gomer NJ | White MA | Gomer reported that Foster asked her to marry him; Gomer sought White's advice on whether marriage would advance her scheme to defraud Foster. |
| Email | 07/16/08 | White MA | Gomer NJ | White states that she is not surprised by Foster's proposal, and states it may help Gomer with any legal challenges after his death. With regard to the potential sale of Foster's home, White advises that CA has no estate tax but both NY and MA do. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| U.S. Mail | 08/14/08 | Pierce CA | White MA | Pierce forwards to White a draft petition to be filed in CA probate court regarding the transfer of Foster's CA residence to a trust controlled by Gomer. |
| Telephone | 08/20/08 | Gomer MA | S. Foster NY | Gomer made false representations regarding Foster's health and instructed Sarah Foster not to visit or call Foster; these actions were designed to further conceal Gomer's fraud. |
| Telephone | 08/24/08 | Gomer / Foster MA | S. Foster NY | Gomer caused Foster to instruct Sarah Foster to "stop meddling in his life" in an attempt to further conceal Gomer's fraud. |
| Type of Communication | Date | From | To | Purpose |

| Email | 08/26/08 | White MA | Gomer MA | White advised Gomer on how to thwart the investigation of ESCC, further advancing and concealing Gomer's fraud. |
|---|---|---|---|---|
| Mail | 08/28/08 | Gomer MA | S. Foster NY V. Foster MA | Gomer falsely wrote that she was no longer going to take care of Foster, lulling the Foster daughters and attempting to delay any further intervention. |
| Telephone | 09/03/08 | Lawson MA | Volmes MA | Lawson caused ESCC to terminate its investigation, further advancing and concealing Gomer's fraud. |
| U.S. Mail | 10/07/08 | Brossmer CA | White MA | Transfer of jewelry appraisal for purposes of Chang's Estate and to facilitate the fraud upon Foster. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| Emails | 10/08/08 | White MA | Pierce CA Gomer NJ | Organizing the appraisal of Foster's CA real estate. |
| Email | 10/13/08 | Gomer MA | White MA | Gomer discussed her plans to sell Foster's California property. The liquidation of such property would facilitate the fraudulent transfer of the proceeds of said sale to Gomer or other members of the Chang Family. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| Email | 10/16/18 | White MA | Gomer MA | White instructed Gomer on the liquidation of Foster's Colgate shares for use in the payment of Chang's estate tax, wrongfully burdening Foster with that liability for the benefit of Gomer and other members of the Chang Family. |
| Email | 10/24/08 | Gomer NJ | White MA | Gomer updated White on financial transactions related to the payment of Chang's estate taxes. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| Email | 10/25/08 | Gomer NJ | White MA | Gomer informed White that $1,885,000 would be wired from the Survivor's Trust to White's law firm trust account, wrongfully burdening Foster with the payment of Chang's estate tax. |
| Email | 10/28/08 | Gomer NJ | White MA | Gomer falsely explained how she came into possession of Chang's jewelry in an effort to further conceal her fraud upon Foster. |
| Telephone | 11/09/08 | Gomer MA | S. Foster NY | Gomer falsely stated that there was no room for the Foster daughters at Foster's home, advancng and concealing Gomer's fraud. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| Email | 12/11/08 | Gomer NJ | White MA | Gomer discussed Foster's reluctance to sell his property in California and the ESCC's investigation. Gomer and White strategized about their ability to maintain control over Foster's assets and to further perpetuate the fraud upon Foster. |
| Telephone | 01/02/09 | Gomer NJ | Foster MA | Gomer informed Foster that she was moving him from Nantucket to New York or New Jersey and threatened to burn down Foster's Nantucket house, further attempting to extort Foster and to conceal her fraud. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|

| Telephone | 01/07/09 | Gomer NJ | Volmes MA | Gomer falsely represented that she could not pay for repairs to Foster's home because his accounts were frozen, further attempting to conceal her fraud and the control she exercised over Foster's financial affairs. |
| U.S. Mail | 04/28/09 | Yong Sam Chang / Kim | Dep't of Treasury | Yong Sam Chang and Kim falsely represented that Chang's jewelry had passed to Foster when it had, in fact, been in Gomer's possession since Chang's death. |

| Type of Communication | Date | From | To | Purpose |
|---|---|---|---|---|
| U.S. Mail | 12/21/10 | Gomer / Yong Sam Chang | Superior Court – State of California | Gomer and Yong Sam Chang's petition, which falsely representing (among other things) that the beneficiaries of the DAF Trust were entitled to a distribution of 50,000 shares of Colgate-Palmolive stock. |

169.   Upon information and belief, some of the wire communications described above occurred between persons in the same state but crossed interstate borders by reason of the technology and other mechanisms used to transmit the communication.

170.   Each and every use of the U.S. Postal Service or interstate wires described above was committed by Gomer, White, and their co-conspirators with the specific intent to defraud Foster or for obtaining the money or property of Foster by means of false or fraudulent pretenses, representations, or promises. Gomer's, White's, and their co-conspirators' acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

171. Foster (and his rightful agents) justifiably relied on Gomer's, White's, and and their co-conspirators' fraudulent representations and omissions made pursuant to the above-described scheme in that, among other things, Foster appointed Gomer his power of attorney, executed documents that transferred property or control over property to Gomer, Foster paid for all of Chang's estate taxes when such taxes should have been paid by Chang's estate, Foster paid for the services of Siedman (who was not providing any legitimate services to Foster but was merely monitoring Foster for the benefit of Gomer), Foster paid for the advice and counsel of White (who was not representing Foster's interests but was representing only the interests of Gomer), and Foster instructed his daughters not to visit or communicate with him based upon Gomer's false representations regarding his daughters.

**Interstate Transportation of Stolen Property**

172. Gomer devised and intended to devise a scheme or artifice to defraud and obtain Foster's money by false pretenses, representations or promises and transported, caused to be transported, and induced persons to travel and be transported in interstate commerce in the execution or concealment of the scheme or artifice to defraud in violation of 18 U.S.C. § 2314. In particular, Gomer, among other things, transported and caused to be transported in interstate commerce jewelry, documents, money, keys, and other personal property that belonged to Foster and had a value in excess of $5,000.