1  JEFFREY E. GRELL (pro hac vice)
2  jgrell@grellfeist.com
   GRELL & FEIST LLC
3  825 Nicollet Mall, Suite 1648
4  Minneapolis, MN 55402
   Telephone: (612) 259-8314
5  Facsimile: (612) 354-7230

6
   Gary Kurtz, SBN 128295
7  Gary@garykurtzlaw.com
8  LAW OFFICE OF GARY KURTZ
   A Professional Law Corporation
9  20335 Ventura Boulevard, Suite 200
10 Woodland Hills, California 91364
   Telephone: (818) 884-8400
11 Telefax: (818) 884-8404

12
   Attorneys for Plaintiff Estate of
13 David R. Foster

14              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
15                   WESTERN DIVISION

16

17 ESTATE OF DAVID R. FOSTER, by        Case No.: CV11 1242 PA (DTBx)
18 its Executor Sarah Foster,
                                         [The Honorable Percy Anderson]
19          Plaintiff,

20
            vs.
21                                       **PLAINTIFF'S OPPOSITION TO**
22 AEHUI GOMER, DONNA WHITE,             **DEFENDANT DONNA WHITE'S**
   ALBERT E. SIEDMAN, YONG SAM          **MOTION FOR SUMMARY**
23 CHANG, a/k/a MICHAEL CHANG,          **JUDGMENT**
24 and SUNG HUI KIM,
                                         Date:  September 9, 2013
25          Defendants.                  Time: 1:30 p.m.
26                                       Courtroom 15

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   CREATION OF THE TRUSTS . . . . . . . . . . . . . . . . . . . . 1

    B.   WHITE'S INITIAL ENGAGEMENT . . . . . . . . . . . . . . . . . 2

    C.   ALEX'S ESTATE PLAN & DEATH . . . . . . . . . . . . . . . . . 3

    D.   WHITE AND GOMER INSTALL GOMER AS
       ALEX'S PROXY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    E.   GOMER SELLS THE CP SHARES IN THE
       SURVIVOR'S TRUST . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    F.   PAYMENT OF ALEX'S ESTATE TAXES . . . . . . . . . . . . . 10

    G.   GUARDIANSHIP PROCEEDINGS TERMINATE
       GOMER AND WHITE'S SCHEME . . . . . . . . . . . . . . . . . . 10

II.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.   CAL. CODE CIV. PROC. § 340.6(a) DOES NOT BAR
       FOSTER'S CLAIMS FOR MAIL / WIRE FRAUD (RICO),
       ELDER ABUSE, FRAUD OR CONSTRUCTIVE FRAUD . . . 12

    B.   EVIDENCE SUPPORTS THE ESSENTIAL ELEMENTS OF
       FOSTER'S CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       1.   Evidence Supports Foster's Section 1962(c) RICO Claim . . 17

       2.   Evidence Supports Foster's Section 1962(d) RICO Claim . . 19

       3.   Foster's Breach of Fiduciary Duty Claim is Actionable . . 20

       4.   Foster's Elder Abuse Claim is Actionable . . . . . . . . . . . . 21

       5.   Evidence Supports Foster's Unjust Enrichment Claim . . . . 22

**C. NONE OF FOSTER'S CLAIMS REQUIRE PROOF OF FOSTER'S MENTAL INCAPACITY** . . . . . . . . . . . . . . . . 22

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

*Cases*

*AllWaste, Inc. v. Hecht*, 65 F. 3d 1523 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . 18

*Alvarez v. T-Mobile USA, Inc.*, 2011 WL 6702424 (E.D. Cal. 2011) . . . . . . . . 12

*Aqua Connect v. Code Rebel, LLC,* 2013 WL 3820544 (C.D. Cal. 2013) . . . . . 17

*Bias v. Wells Fargo & Co.,* 2013 WL 1787158 (N.D. Cal. 2013) . . . . . . . . . . . 12

*Bourgeois v. Hurley*, 8 Mass. App. Ct. 213,
    392 N. E. 2d 1061 (Mass. Ct. App. 1979) . . . . . . . . . . . . . . . . . . . . . . 13-14

*Boyle v. United States*, 556 U.S. 938 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*California Fed. Bank v. Matreyek,* 8 Cal.App.4th 125,
    10 Cal.Rptr.2d 58 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Carter v. County of Los Angeles,* 770 F. Supp.2d 1042 (C.D. Cal. 2011) . . . . . 16

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*D&J Tire, Inc. v. Hercules Tire & Rubber Co.,*
    598 F.3d 200 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ellison Educational Equip., Inc. v. Chen,*
    2004 WL 3154592 (C.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Estate of Gonzales v. Hickman,* 2007 WL 3237727 (C.D. Cal. 2007) . . . . . . . . 12

*Estate of Heggstad*, 16 Cal. App. 4th 943, 20 Cal. Rtpr. 2d 433 (1993) . . . . . 14-15

*Fritz v. Ehrman,* 136 Cal. App.4th 1374, 136 Cal. App. 4th 1374 (2006) . . . . . . 20

*Ghirardo v. Antonioli,* 14 Cal.4th 39, 57 Cal.Rptr.2d 687,
    924 P.2d 996 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gunther v. Dinger*, 547 F. Supp. 25, 27 (S.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . 19

*In re Perkins Estate*, 195 Cal. 699, 235 P.2d 45 (1925). . . . . . . . . . . . . . . . . . . . 22

*Handeen v. LeMaire,* 112 F.3d 1339 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 11

*H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229 (1989) . . . . . . . . . 17

*Lazar v. Superior Court,* 12 Cal. 4th 631, 638, 909 P.2d 981 (1996) . . . . . . 12, 14

*Lectrodryer v. SeoulBank,* 77 Cal.App.4th 723,
     91 Cal.Rptr.2d 881 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Miller v. Yokohama Tire Corp.*, 358 F.3d 616 (9th Cir. 2004) . . . . . . . . . . . . . . .13

*Neel v. Levy, Levy, Cathcart & Gelfand*, 6 Cal. 3d 176,
     98 Cal. Rptr. 837, 491 P.3d 421 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994) . . . . . 19

*Nissan Fire & Marine Inc. Co., Ltd. V. Fritz Co., Inc.*,
     210 F.3d 1099 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Oki Semiconductor Co. v. Wells Fargo Bank,* N.A.,
     298 F.3d 768 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Pereira v. United States*, 347 U.S. 1 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Salinas v. United States*, 522 U.S. 52 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Samuels v. Mix 22* Cal. 4th 1, 91 Cal. Rptr. 2d 273, 989 P.2d 701 (1999) . . . . . . 20

*Santry v. France*, 327 Mass. 174 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*,
     634 F. Supp.2d 1009 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Steeger v. Odell*, 18 Cal. 2d 409, 115 P.2d 977 (Cal. 1941) . . . . . . . . . . . . . . . . 23

*United States v. Beecroft*, 608 F.2d 753 (9th Cir 1979) . . . . . . . . . . . . . . . . . . . 14

*United States v. Sayakhom*, 186 F.3d 928 (9th Cir. 1999), *cert. denied*,
     528 U.S. 1179 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*United States v. Svete*, 556 F.3d 1157 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . . 23

*United States v. Woods*, 335 F. 3d 993 (9th Cir.), *cert. denied*,
     540 U.S. 1025 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Rules & Statues**

18 U.S.C. § 1961(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 1962(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19

18 U.S.C. § 1962(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

Cal. Civ. Code § 1573(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Cal. Code Civ. Proc. § 340.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-17, 20

Cal. Wel. & Inst. Code § 15610.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Cal. Wel. & Inst. Code § 15657.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Cal. Wel. & Inst. Code § 15610.30(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Civ. P. 56(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Plaintiff Estate of David R. Foster ("Foster") hereby respectfully opposes Defendant Donna White's Motion for Summary Judgment (*130*). White's motion must be denied because it ignores two fundamental realities:  1) that fraudulent omission, concealment or nondisclosure is actionable; and 2) that Foster's mental incapacity is not an element of any claim pled by Foster.  White's motion is also based primarily on her self-serving testimony and inferences drawn in her favor, turning the standard of review for summary judgment on its head.  For these reasons, and many others, White's motion must be denied.

## I.   STATEMENT OF FACTS

### A. CREATION OF THE TRUSTS

On May 15, 1987, Foster and his wife, Patricia, established the Foster Family Trust ("FFT").  (*Plaintiff's Statement of Genuine Disputes of Material Fact In Opposition to Defendant Donna White's Motion for Summary Judgment ("SDF")* at ¶ 3, 5.)  After Patricia's death in 1994, the FFT was divided into three subtrusts:  the Survivor's Trust, the Marital Trust, and the Credit Trust.  (*Id.* at ¶ 5.) As its trustee, Foster "ha[d] sole control over all the assets" of the Survivor's Trust. (*Id.* at ¶ 112.)

On May 22, 1996, Foster and Alexandra Chang ("Alex") entered into a Premarital Agreement.  (*Id.* at ¶ 7.) Foster agreed to create The David and Alexandra Foster Trust ("DAFT") and to fund it with 25,000 CP shares, among other assets. (*Id.* at ¶ 8.) Foster and Alex were thereafter married.  (*Id.* at ¶ 6.) Prior to her marriage to Foster, Alex had no separate assets.  (*Id.* at ¶ 113.)

The DAFT was established on February 27, 1997.  (*Id.* at ¶ 9.) *Schedule A* to the DAFT stated that 25,000 shares of CP stock, among other properties,

constituted the principal of the DAFT.  (*Id.* at ¶ 114.)  Pursuant to Section 2.3, the survivor of either Foster or Alex received the DAFT estate.  (*Id.* at ¶ 116.)  By 2003, Section 2.3 had been amended to state:

> In the event Alexandra C. Foster predeceases [Foster], and ***in the event the assets of the Trust estate include stock of the Colgate Palmolive Company***, the Trustee shall distribute fifty percent (50%) of that stock, outright, free of trust, in equal shares, to the following individuals who survive Alex C. Foster:  [Alex's four siblings, and Victoria and Sarah Foster].  The remaining fifty percent of the Colgate Palmolive stock and the balance of the Trust Estate shall be distributed outright and free of trust to [Foster].

(*Id.* at ¶ 116 (emphasis added).)  On September 3, 2003, Alex was appointed a co-trustee of the FFT Survivor's Trust.  (*Id.* at ¶ 117.)

## B. WHITE'S INITIAL ENGAGEMENT

White first worked with the Fosters on their estate plan in 2005. (*Id.* at ¶ 16.) With regard to the amended Section 2.3 of the DAFT, White wrote to her supervising attorney:  "the gift only occurs [if] the trust is holding Colgate and it distributes 50% of that stock.  If David diversifies the gift isn't made."  (*Id.* at ¶ 118.)  Neither White nor her supervisor ever prepared any documents removing the inconsistency between Section 2.3 and *Schedule A*.  (*Id.* at ¶ 119.)  In fact, White never even discussed Section 2.3 with Foster or Alex. (*Id.*)

In 2005, White prepared and the Foster's executed (among other documents)

a revocation of the Premarital Agreement. (*Id.* at ¶¶ 22, 24.) Revocation of the agreement cancelled everything, returning everything to the status quo prior to the agreement.  (*Id.* at ¶ 119.) After White's initial engagement, White and Alex spoke weekly on the telephone, developing a close personal relationship.  (*Id.* at ¶ 120.)

In July 2005, White assisted the Fosters in moving the Survivor's Trust and other FFT accounts from the ML office in Indian Wells to the ML office in San Francisco.  (*Id.* at ¶ 121.) At the time, the Survivor's Trust held 120,000 CP shares.  (*Id.* at ¶ 122.)  Alex was listed as a co-trustee on all accounts and was authorized to engage in transactions on the accounts with powers equal to Foster's.  (*Id.* at ¶ 123.)  Benjamin Lam, the Fosters' investment advisor, spoke mostly to Alex.  (*Id.* at ¶ 124.)  He does not ever recall any discussion of the DAFT and was never asked to open an account in the name of the DAFT.  (*Id.*)  Mary Brock, Foster's accountant, testified that Foster knew that there was no DAFT account because he "refused to separate the [Survivor's Trust] shares from the beginning."  (*Id.* at ¶ 125.)

## C. ALEX'S ESTATE PLAN & DEATH

In April 2006, White changed firms and became a partner.  (*Id.* at ¶ 126.) White thereafter was the Foster's "sole estate planning attorney." (*Id.*)  On September 27, 2006, Alex executed a Will and a Revocable Trust, both were prepared by White and assumed that Alex would survive Foster.  (*Id.* at ¶ 127.)  In particular, Alex's Revocable Trust called for the distribution of the Foster's homes, which Alex would inherit only if she survived Foster, and made cash gifts that Alex could not afford unless she survived Foster.  (*Id.* at ¶ 128.)

On November 16, 2006, Alex wrote to White:  "I'm very fortunate to have

you looking after our family affairs in general," and signed the letter: "With much love / Your sister / Alex." (*Id.* at ¶ 129.)   On November 28, 2006, Alex amended her Revocable Trust with the assistance of another attorney. (*Id.* at ¶¶ 35, 36, 37.) The amendment purported to distribute $100,000 from the assets of Alex's estate to each of White's two daughters. (*Id.* at ¶ 36.)   White received a copy of the amendment shortly after it was executed. (*Id.* at ¶ 38.)   White never disclosed the gift to Foster. (*Id.* at ¶ 130.)

Alex was diagnosed with cancer in 2007 and died on January 31, 2008. (*Id.* at ¶¶ 41, 43.)   After Alex's diagnosis but before her death, White pondered: "Should Alex predecease / What happens… rearrange estate plans." (*Id.* at ¶ 131.) Between December 19, 2007 and February 1, 2008, White's invoices also record eleven time entries, relating to discussions with Alex, Lam, and Gomer, the review and revisions of estate plans and trust documents, consideration of tax and community property issues, trust revocation, and the review of the "prenuptial agreement and revocation re [sic] whether trust property was community o[r] separate property." (*Id.* at ¶ 132.)   On January 24, 2008, one week before her death, Alex wrote to White:

> . . . Ever since I mentioned my medical problems, of course, my estate planning was discussed with you.  But until now I haven't had the energy or courage to discuss it with David as yet!  /  I trust you will use utmost intelligent mind to execute the problems in our favor. . . .

(*Id.* at ¶ 133.)   Alex further stated the "Merrill Lynch (Survivor's trust) this is

mine" (*Id*.)  Once again, Alex signed the letter:  "With much love / Your elder Sister / Alex." (*Id*.) White did not revise Alex's estate plan before she died.  (*Id*. at ¶ 134.)

At the time of Alex's death, all of Foster's CP shares were held in ML accounts titled in the names of the FFT subtrusts; the Survivors Trust held 120,000 shares.  (*Id*. at ¶ 135.)  The DAFT did not even have an account.  (*Id*. at ¶ 124.) White claims that until Alex died, White was unaware that there was no DAFT account.  (*Id*. at ¶ 137.)  Documents pre-dating Alex's death, however, establish that White knew, or should have known, that all of Foster's CP shares were held in the FFT accounts at ML.  (*Id*.)

White formally served as counsel for both Foster and Alex's estate until January 2009, if not longer.  (*Id*. ¶ at 138.)

## D.   WHITE AND GOMER INSTALL GOMER AS ALEX'S PROXY

After Alex's death, Gomer (Alex's actual sister) and White (Alex's adopted sister) began a campaign to install Gomer as Alex's proxy and to transfer as much of Foster's property to Alex's estate as possible. (*Id*. at ¶139.)  White wanted to shield herself from a malpractice claim and to safeguard Alex's $200,000 gift to her daughters.  (*Id*.)  After all, the fundamental premise of Alex's estate plan, prepared by White, was that she would survive Foster.  (*Id*.) Then, when it became apparent that Alex may not survive Foster, White failed to act quickly enough to revise Alex's estate plan or to even advise Alex that the Survivor's Trust was not, in fact, hers unless she survived Foster. (*Id*.) White regretted her utter failure as Alex's attorney and "sister" and wanted to redeem herself, albeit at the expense of Foster. (*Id*.)

1
2
3
4
5
6
7
8
9
10
11

Gomer was visiting the Foster home in California before and after Alex's death. (*Id.* at ¶ 140.)  Mary Axelrod, Foster's housekeeper, testified that shortly after Alex died she came to work and Gomer said to Foster "are you going to tell her?" (*Id.* at ¶ 141.)  Foster replied that he and Gomer were getting married. (*Id.*)  According to Axelrod, Gomer "kind of just sat there with a smile on her face." (*Id.*)  Gomer, however, was already married to her husband of 37 years and intimately involved with another man named Albert Siedman.  (*Id. at* ¶ 145.) Gomer's journal confirms that Foster talked about a life with her on February 3. (*Id. at* ¶ 146.) The next day, White called regarding the appointment of positions. (*Id.*)

12
13
14
15
16

On February 7, Keith Lyrla, Brock's supervisor, wrote a memorandum regarding whether Alex's estate contained half the CP shares in the Survivor's Trust. (*Id.* at ¶ 147.) Lyrla concluded: "[t]he short answer to ALL of the questions is – ***I don't know***." (*Id.* (emphasis added).) Lyrla suggested that Foster hire attorney David Erwin (among others) to figure out the situation. (*Id.*)

17
18
19
20
21
22

In February, White prepared a power of attorney ("POA") and health care proxy naming Gomer as his agent and prepared amendments to the FFT and DAFT naming Gomer co-trustee. (*Id.* at ¶ 46.)  White sent the documents to Foster, who in turn discussed them with Erwin. (*Id.* at ¶ 148.)  White did not inform Erwin that she was also involved in Alex's estate. (*Id.* at ¶ 149.)

23
24
25
26
27

White and Gomer met in New York City on February 20. (*Id.* at ¶ 150.) White's notes from that period reflect that they discussed "POA from David – as ind[ividual] and trustee." (*Id.*)  At this same time, Foster told Brock that he wanted to annul the gift and asked if there was any possibility to overturn the gift of CP shares to Alex's estate. (*Id.* at ¶ 151.) In fact, Foster told Brock: "[Alex] doesn't

28

6

have a goddamn estate." (*Id.*)  Gomer testified that Foster would berate all women, including Alex and his daughters, claiming they were all after his money.  (*Id.* at ¶ 152.)  Brock and Lyrla encouraged Foster to get a lawyer other than White.  (*Id.* at ¶ 153.)

On February 25, Gomer emailed White that Brock and Erwin discussed with Foster the "Survivor's trust and his need to release half of it to Alex's estate."  (*Id.* at ¶ 154.)  According to Gomer, they "had to convince him that it's not worth the trouble to dispute the legality of it."[1]  (*Id.*)  Gomer's email continued:

> I've tried to impress upon David to not bother with a new team of
>
> counselors, and that his affairs should not be in any conflict with
>
> [Alex's] estate, nor with you [White] . . .  The politik of the
>
> situation is that more he moves away from you, more remote the
>
> possibility of my connection with David, thus I feel that I have a
>
> personal interest in the matter. . . .  He can be a little too easy to be
>
> swayed, at least temporarily…

(*Id.*)  At this time, White was aware of the CP share titling issue but failed to disclose it to Gomer.  (*Id.* at ¶155.)  White simply responded:  "I plan to move ahead with Alex's estate and stay focused on that path.  I certainly do hope David comes around …."  (*Id.* at ¶156.)  White further told Brock that "she was going to have to come to California and explain things to [Foster]." (*Id.* at ¶157.)

The documents prepared by White were executed on March 17.  (*Id.* at ¶ 52.)  That same day, Foster signed a form authorizing Gomer to instruct ML on

---

[1] Neither Brock nor Erwin recall this discussion with Foster. (*Id.* at ¶ 154.)

transactions and distributions from the Survivor's Trust.  (*Id.* at ¶ 158.)

During an April 21 meeting with Foster and Gomer in New York, White presented a flowchart to Foster falsely indicating the DAFT contained 100,000 shares of CP stock.  (*Id.* at ¶160.)  White also stated that 50% of the CP shares "would be distributed outright in equal shares to Alexandra's four siblings and [Foster's daughters]."  (*Id.*)  According to White: "… I [sat] down with him and show[ed] him a picture of [the DAFT] that showed shares going out that was crystal clear…" (*Id.*)  White never discussed with Foster the discrepancy between the ML account titled in the name of the Survivor's Trust versus those shares being used to satisfy the obligations of the DAFT.  (*Id.* at ¶ 161.)  White did not explain to Foster that he could take the position that he was not obligated to transfer the shares to Alex's estate. (*Id.* at ¶ 161, 159.)

On May 9, 2008, Foster executed a will and revocable trust that were prepared by White and named Gomer "as the beneficiary of all of his assets" that he had the power to convey.  (*Id.* at ¶ 163.)  Gomer's journal notes that Foster was "ill-humored" and "worn out."  (*Id.* at ¶ 164.)  Upon execution of these documents, White states: "***In my opinion I was giving Aehui exactly what [Foster] had given Alex***." (*Id.* at ¶ 165 (emphasis added).)   This was the last time that White communicated with Foster or saw him face-to-face.  (*Id.* at ¶ 167.)

On May 30, Gomer informed White that Foster is "still staggered by the idea of losing half of the survivors trust to Alex's beneficiaries…."  (*Id.* at ¶ 168.)  Once again, White never disclosed the CP titling issue to Foster.  (*Id.* at ¶ 188.)

**E.  GOMER SELLS THE CP SHARES IN THE SURVIVOR'S TRUST**

By July 7, 2008, Gomer and Foster were at Foster's summer home on

Nantucket.  (*Id.* at ¶ 169.)  Gomer informed White that Foster "is not terribly well" and referred to herself as Foster's "surrogate wife."  (*Id.*)  Gomer asked White if a "transfer of assets to [Gomer's] name before anything happens" would help stave off challenges from Foster's daughters and sought White's input on the legal ramifications of her and Foster getting married.  (*Id.* at ¶ 172.)  White responded: "I can't see that [marriage] would hurt you on the legal side and may very well help you."  (*Id.*)  Gomer was never White's client.  (*Id.* at ¶ 173.)

During this time, White also counseled Gomer to treat the assets of the Survivor's Trust as being in the DAFT and to sell some CP shares to pay Alex's estate taxes.  (*Id.* at ¶ 174.)  Gomer, as co-trustee of the Survivor's Trust, then ordered Lam to sell 30,000 CP shares and instructed him to contact White with any questions.  (*Id.* at ¶ 175.)   The shares were sold in lots of 10,000 on July 30, August 5, and September 15, generating approximately $2.3 million in proceeds. (*Id.* at ¶ 176.)

In August 2008, Elderly Services of Cape Cod ("ESCC") began investigating Foster's situation and spoke to him to arrange a meeting.  (*Id.* at ¶ 177.)  The ESCC investigator believed that Foster wanted to meet her.  (*Id.*) James Lawson, an attorney at White's law firm, however, later contacted the investigator and told her that Foster had a guardian.  (*Id.* at ¶ 178.)  Believing that Foster was under the care of a court-appointed guardian, ESCC backed off.  (*Id.*) Lawson was enlisted by White because Gomer told her that Foster did not want to speak to ESCC.  (*Id.* at ¶ 179.)  White never confirmed Gomer's instructions with Foster.  (*Id.*)  White also admits that she may have told Lawson that Gomer was Foster's guardian.  (*Id.*)

## F. PAYMENT OF ALEX'S ESTATE TAXES

On October 3, eighteen days after Gomer sold the last lot of CP shares, Gomer abandoned Foster at Sherburne Commons, an assisted living facility, and left Nantucket. (*Id.* at ¶ 182.) Gomer informed White that Foster was in an assisted living facility because of his "feeble" condition and the need to "avoid his alcohol abuse." (*Id.* at ¶ 183.) Gomer admits that being left alone in Sherburne Commons was "for sure" Foster's worst nightmare. (*Id.* at ¶ 184.)

On October 16, 2008, White was checking with Lam on the liquidation of the CP shares from the "Survivor's Trust" to pay Alex's estate taxes. (*Id.* at ¶ 185.) On October 24, Gomer informed White that Foster "is hanging in there, but is struggling;" Gomer further asked White about "wiring the assets that remained in the Survivor's trust." (*Id.* at ¶ 185.) On October 25, Gomer sought White's confirmation that the "[m]oney [is] coming out of the Survivor's trust account." (*Id.*) White replied that Gomer's understanding was "correct." (*Id.*) Gomer sent wiring instructions to ML on October 27 and told them to contact White if they had questions. (*Id.* at ¶ 186.) On October 29, Gomer authorized ML to transfer $1,885,000 from the Survivor's Trust to the trust account at White's law firm. (*Id.*) The letter of authorization was signed only by Gomer as Trustee of the Survivor's Trust; there is no evidence that anyone informed Foster of the sale of CP shares or the transfer of proceeds. (*Id.* ¶¶ 186, 191.)

## G. GUARDIANSHIP PROCEEDINGS TERMINATE GOMER AND WHITE'S SCHEME

On November 28, a visiting nurse noted that Foster was "expressing worry over financial matters that he doesn't understand." (*Id.* at ¶ 192.) On December 4, Gomer wrote Foster, telling him to sell his homes and buy a house in New Jersey

10

where she was then residing.  (*Id.* at ¶ 194.)  She also said she wanted to sell another 1,000 CP shares. (*Id.*)  On December 11 and 12, Gomer told White that "David isn't sure about selling his houses" and asked for "further instructions." (*Id.* at ¶ 195.)

On December 24, White sent a letter to Foster's daughter, again falsely stating that at the time of Alexandra's death, "the [DAFT] held 120,000 shares of [CP] stock." (*Id.* at ¶ 196.)

On January 15, 2009, Foster's daughters filed a petition for Foster's guardianship.  (*Id.* at ¶ 105.)  White did not refuse Alex's $200,000 gift until March 24, after Foster's temporary guardian was appointed.  (*Id.* at ¶ 199.)  Meanwhile, White was also concealing the opinion she had expressed throughout 2008, i.e., the CP shares were owned by the DAFT at the time of Alex's death. (*Id.* at ¶ 200.)  She wrote to counsel for Foster's daughters:  "the current assets of the Survivor's Trust at ML are as follows: It contained 120,000 shares at Alexandra's death…" (*Id.*)  During the guardianship proceeding, White continued to answer to questions and provide documents to the guardian as Foster's former counsel.  (*Id.* at ¶ 202.)

Foster died on June 4, 2010.  (*Id.* at ¶ 1.)   Under the supervision of the guardianship proceedings, Foster created a new will and trust, leaving all of his assets to his daughters. (*Id.* at ¶ 201.)

## II.   **ARGUMENT**

The filing of a motion for summary judgment does not immediately compel the non-moving party to come forward with evidence demonstrating material issues of fact as to every element of its case.  *Handeen v. LeMaire*, 112 F.3d 1339,

11

1346 (8th Cir. 1997). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and demonstrating the absence of genuinely disputed material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If, and only if, the moving party meets its burden, then the non-moving party must produce evidence rebutting the moving party's claim and disputing the material facts. *Ellison Educational Equip., Inc. v. Chen*, 2004 WL 3154592, *2 (C.D. Cal. 2004). Even if the nonmoving party's evidence is presented in a form that is currently inadmissible, such evidence may be evaluated on a motion for summary judgment so long as the moving party's objections could be cured before or at trial. *Alvarez v. T-Mobile USA, Inc.*, 2011 WL 6702424, *3 (E.D. Cal. 2011). In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *Estate of Gonzales v. Hickman*, 2007 WL 3237727, *4 (C.D. Cal. 2007). Rather, it draws all inferences in the light most favorable to the non-moving party. *Id.*

A. **CAL. CODE CIV. PROC. § 340.6(a) DOES NOT BAR FOSTER'S CLAIMS FOR MAIL / WIRE FRAUD (RICO), ELDER ABUSE, FRAUD OR CONSTRUCTIVE FRAUD.**

Cal. Code Civ. Proc. § 340.6(a) states that it does not apply to actions against an attorney for "actual fraud." Foster's claims based on federal mail or wire fraud, elder abuse, and common law fraud require proof of fraudulent intent. *See Bias v. Wells Fargo & Co.*, 2013 WL 1787158, *14 (N.D. Cal. 2013), Cal. Wel. & Inst. Code § 15610.30(a)(1-2), *Lazar v. Superior Court*, 12 Cal. 4th 631, 638, 909 P.2d 981, 984-85 (1996).[2]

---

[2] Cal. Civ. Code § 1573(2) imposes liability for constructive fraud without respect to actual fraud, i.e., although evidence of fraudulent intent is not necessary,

1
2
3
4
5
6
7
8
9

Throughout 2008, White affirmatively misrepresented to Foster or his agents that the DAFT contained shares of CP stock at the time of Alex's death.  At ML, the name on the account statement determines who owns the shares in the account. (*Id.* at ¶ 136.)  *See ECF 130* at 17 (citing *Bourgeois v. Hurley*, 8 Mass. App. Ct. 213, 392 N.E.2d 1061, 1064 (Mass. Ct. App. 1979) (settlors intent to include property in trust was evidenced by the fact that he placed the shares in a checking account bearing the trust's name)).[3]   There is no dispute that, at the time of Alex's death the shares at issue were held by the Survivor's Trust. (*Id.* at ¶ 200.)

10
11
12
13
14
15
16
17
18
19
20
21
22

White's misrepresentation that the DAFT held the shares is a misrepresentation of fact, not law.  Regardless, misrepresentations of law may constitute fraud when the party making the misrepresentation: 1) purports to have special knowledge; 2) owes fiduciary duties to the recipient; *or* 3) has successfully endeavored the confidence of the recipient.  *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004).  White's relationship with Foster satisfies all of these conditions.  White purports to engage in a "trust and estate practice that includes both planning and administration" and, in 2006 she became the Foster's "sole estate planning attorney." (*SDF* ¶ 126.)  White was Foster's attorney and owed him fiduciary duties. (*Id.*)  White also endeavored Foster's confidence by showing him a "crystal clear" picture of how the shares flowed from the DAFT to Alex's beneficiaries. (*Id.* at ¶ 160.)

23
24
25

Under the mail and wire fraud statutes, "[d]eceitful statements of half truths or the concealment of material facts is ***actual fraud***." *United States v. Sayakhom*, 186 F.3d 928, 941 (9th Cir. 1999), *cert. denied*, 528 U.S. 1179 (2000) (emphasis

26
27
28

the presence or absence of such evidence does not obviate the claim.
[3] Foster does not concede that Massachusetts law applies to this dispute.

1   added).  The deception need not be premised upon verbalized words alone. *United*
2   *States v. Woods*, 335 F.3d 993, 998 (9th Cir.), *cert. denied*, 540 U.S. 1025 (2003).
3   The arrangement of words, or the circumstances in which they are used may
4   convey the false and deceptive appearance. *Id.*  Moreover, as Judge Matz noted in
5   denying an earlier motion to dismiss in this case:  "a scheme to defraud may be
6   based on a nondisclosure when there exists an independent duty that has been
7   breached by the person so charged. This independent duty may exist in the form of
8   a fiduciary duty to third parties."[4]  (*ECF No. 43* at 12-13.)  One who is recklessly
9   indifferent to whether a statement is true or false is also charged with knowledge of
10  its falsity. *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979).

11       White concealed material facts when she failed to tell Foster that the CP
12  shares were, in fact, held by the Survivor's Trust at the time of Alex's death. (*SDF*
13  at ¶ 135.)   White made a deceitful statement of half-truth or was recklessly
14  indifferent to the truth when she told Foster that the DAFT contained the shares.
15  (*Id.* at ¶¶ 160-161.)  At a minimum, White should have explained to Foster that
16  although the CP shares were titled in the name of the Survivor's Trust, it was her
17  opinion, pursuant to *Estate of Heggstad*, 16 Cal. App. 4th 943, 20 Cal. Rtpr. 2d 433
18  (1993) and *Bourgeios*,[5] that Alex's estate owned the shares. White should have

---

[4]   White's affirmative misrepresentations, acts of nondisclosure, and concealment also support Plaintiff's common law claims for fraud and constructive fraud.  (*ECF No. 130* at 22-23 (citing *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F. Supp.2d 1009, 1021 (N.D. Cal. 2007) and *Lazar*, 909 P.2d at 984-85).

[5]   Given the inconsistency between Section 2.3 and *Schedule A* of the DAFT, "the trust document [could not] be given the effect of carrying out the settlor's intent where its words [could not] reasonably be read in a manner that expresses that intent." *Bourgeios*, 392 N.E.2d at 1064; *see also Heggstad*, 20 Cal. Rptr.2d at

28       14

further explained that other professionals may differ with her opinion. (*SDF* at ¶ 162.) The flowchart that White presented to Foster on April 21 deceptively arranged words and circumstances by indicating that the DAFT held "100,000 shs of [CP] stock" and by omitting that the shares were actually held by the Survivor's Trust. (*ECF* at ¶ 160.) White failed to disclose to Foster that, even under the terms of the DAFT, he was not obligated to sell the CP shares and incur the related capital gains, rather he could simply transfer the shares (which would not result in capital gains). (*Id.* at ¶ 161.)   White concealed material facts when she failed to disclose Alex's gift of $200,000 and other conflicts of interest.[6] (*Id.* at ¶ 130.) White failed to correct her misrepresentations and failed to make full disclosure even though she knew, no later than May 30, 2008, that Foster was "staggered by the idea of losing half of the survivors trust to beneficiaries" (*Id.* at ¶ 168.)   These are just a few examples of the affirmative misrepresentations, fraudulent omissions, and deceptive half-truths that corrupted White's relationship with Foster.

White's misrepresentations, fraudulent omissions and half-truths were detrimental and caused damage to Foster.  All of the examples of White's fraud set forth above occurred well before October 29, the day Gomer authorized the transfer of the proceeds of the CP shares sales to pay Alex's estate tax. (*Id.* at ¶ 186.)   White's fraud prevented Foster from learning that White had 200,000 reasons to promote the interests of Alex's estate over his own. (*Id.* at ¶ 190.)

---

443-35 (the court did not identify any inconsistent provisions in the trust at issue).

[6] (*See, e.g., Expert Report of John T. Rogers* (Aug. 3, 2013) ((*Declaration of Jeffrey E. Grell in Opposition to Defendant Donna White's Motion for Summary Judgment* ("*JEG Dec.*") (Aug. 19, 2013), Ex. *39* at §§ 12(a), 12(c), 12(e), 12(h), 12(i), and 12(j).)

White's fraud further deprived Foster of the loyalty owed to him by White and of the opportunity to obtain the material information necessary to make reasonable decisions and to instruct White. (*Id.*) White's fraud prevented him from having knowledge of the need for independent counsel. (*Id.*) Because of White's fraudulent advice, Foster was unaware of any means to avoid the transfer or sale of CP shares, and thus, did nothing to prevent the sale or transfer. (*Id.*)

White's self-serving statements that she did not act with fraudulent intent are not dispositive. Fraudulent intent depends on the credibility of witnesses and is an issue uniquely within the realm of the trier of fact. *D & J Tire, Inc. v. Hercules Tire & Rubber Co.*, 598 F.3d 200, 205 (5th Cir. 2010); *see Carter v. County of Los Angeles*, 770 F. Supp.2d 1042, 1048 (C.D. Cal. 2011.) In addition to the misrepresentations, omissions, and half-truths set forth above, a jury could infer White's fraudulent intent from the fact that she admittedly ***never*** asked Foster what his intentions were, i.e., she never asked whether he intended for the CP shares to be owned by the DAFT or the Survivor's Trust. (*SDF* at ¶ 161.) She never asked why the CP shares were never transferred from the Survivor's Trust account to a DAFT account.[7] One must infer that White did not discuss the issue with Foster because such a discussion would have alerted Foster and jeopardized her ability to achieve her illicit goals. (*Id.* at ¶ 188.) White's fraudulent intent can be inferred from the fact that among all the professionals who considered the question, she was the only one who received a $200,000 gift from Alex and the only one who

---

[7] From 2003 until her death in 2008, Alex was also a trustee of the Survivor's Trust and could have transferred the CP shares to a DAFT account at any time. (*Id.* at ¶ 123.)

16

could ***confidently*** conclude that Alex's estate owned the shares.[8]   (*Id.* at ¶ 189.)

Finally, White's fraudulent intent can be inferred from that fact that she and

Gomer waited until Foster was at his most vulnerable – after he had been

abandoned at Sherburne Commons to live in his worst nightmare – to transfer the

share proceeds out of his account and pay Alex's estate taxes.   (*Id.* at ¶¶ 182-186.)

Regardless of inferences, White essentially admitted her fraudulent intent when she

testified: "*In my opinion **I** was giving Aehui exactly what [**Foster**] had given Alex.*"

(*Id.* at ¶ 165 (emphasis added).)

## B.   EVIDENCE SUPPORTS THE ELEMENTS OF FOSTER'S CLAIMS.

### 1.   Evidence Supports Foster's Section 1962(c) RICO Claim.

As established in Section A (*supra*), evidence establishes that White

engaged in acts of mail and wire fraud.[9]   White's acts of racketeering also

constituted a sufficiently continuous pattern, and White operated and managed an

enterprise.

To prove the continuity of a pattern of racketeering activity a plaintiff must

show that the acts amount to or pose a threat of continued criminal activity.   *H.J.*

*Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989).   White's

---

[8] Other evidence also supports an inference of White's fraudulent intent.
(*See, e.g., SDF* at ¶¶ 139, 145, 154-157, 160-166, 172-173, 179, 185-189, 195-196,
199, 200, 203.)

[9] Because White's motion attempts only to meet her burden of production
with regard to  Foster's allegations of mail and wire fraud, the continuity of the
pattern, and the longevity of the enterprise, Foster is not obligated to produce
anything relating to the other elements of its RICO claim. *Nissan Fire & Marine*
*Inc. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).   A
defendant's conclusory denial of wrongdoing fails to satisfy the threshold
requirements of Rule 56.   *Aqua Connect v. Code Rebel, LLC*, 2013 WL 3820544
(C.D. Cal. 2013).

memorandum discusses only the concept of closed-ended continuity, but continuity can also be established on an open-ended basis.   Open-ended continuity is evidenced by past conduct that threatens to extend indefinitely into the future.  (*Id.* at ¶ 242.)  A defendant's involvement "in multiple criminal schemes . . . [is] highly relevant to the inquiry into the continuity." (*Id.* at ¶ 240.)  White participated in at least three schemes.  First, White and Gomer engaged in a scheme from January 31, 2008 through May 9, 2008 to convince Foster that he was obligated to give the CP shares to Alex's estate and should install Gomer as Alex's proxy. Second, from July through October 2008, White and Gomer orchestrated the sale of Foster's CP shares to pay Alex's estate taxes.  Third, from October through December 2008, Gomer and White were strategizing to sell Foster's properties.

Although the guardianship proceeding prevented Gomer and White from achieving the objective of the third scheme, and ended their ongoing pattern of racketeering, a defendant cannot shield herself from liability on the basis that her pattern of racketeering was "fortuitously interrupted" by court intervention, law enforcement, or by other factors beyond the defendant's control.  *See AllWaste, Inc. v. Hecht*, 65 F.3d 1523, 1530 (9th Cir. 1995).  Because White and Gomer's pattern threatened to extend indefinitely into the future, but for the court's intervention, the evidence establishes that White engaged in a sufficiently continuous pattern of racketeering.[10]

Finally, White is not entitled to summary judgment on the basis that "***an***

---

[10] "Closed-ended" continuity has been found when the pattern lasted only 13 months. *Allwaste*, 65 F.3d at 1528. White's pattern began no later than February 4, 2008 when she contacted Gomer to discuss appointment of positions and ended no earlier than March 24, 2009, when she sent an email concealing her fraudulent statements in 2008 that the DAFT held the CP shares at the time of Alex's death.

1    *association in fact enterprise* must have … longevity sufficient to permit [its

2    members] to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S.

3    938, 947 (2009) (emphasis added).  Foster alleges an association in fact enterprise

4    consisting of White and Gomer.  (*SDF* at ¶ 207.)  As set forth above, White and

5    Gomer were associated long enough to achieve several illicit goals.  *Boyle* does not

6    require a plaintiff to prove that the association in fact enterprise achieved *all* of its

7    *potential* goals.  Moreover, Foster alleges that White also operated and managed

8    an individual (Foster) enterprise[11] and a legal entity (Estate of Chang) enterprise.[12]

9    (*Id.* at ¶ 207.)  *Boyle's* longevity requirement applies only to *association in fact*

10   *enterprises*, and White's motion fails to set forth any facts or arguments that

11   undermine the validity of Foster's alternative, non-association in fact enterprises.

12

13          **2.   Evidence Supports Foster's Section 1962(d) RICO Claim.**

14          Even if White did not violate section 1962(c), she is still liable under section

15   1962(d).  Section 1962(d) forbids the mere agreement to violate RICO and does

16   not require proof that the defendant violated any substantive provision of RICO.

17   *Oki Semiconductor Co. v. Wells Fargo Bank, N.A.*, 298 F.3d 768, 774 (9th Cir.

18   2002). One can be a conspirator by agreeing to facilitate only some of the acts

19   leading to the substantive offense.  *Salinas v. United States*, 522 U.S. 52, 65

20   (1997).   The illegal agreement can be inferred from the words, actions, or

21

22

23          [11] An individual victim can be the enterprise operated and managed by the
     defendants.  *See* 18 U.S.C. § 1961(4); *National Organization for Women, Inc. v.*
24   *Scheidler*, 510 U.S. 249, 259 n.5 (1994); *Reves v. Ernst & Young*, 507 U.S. 170,
25   184 (1993).  The Foster enterprise would include his alter ego, the Survivor's
     Trust. (*SDF* at ¶ 207.)
26
          [12] *See Gunther v. Dinger*, 547 F. Supp. 25, 27 (S.D.N.Y. 1982) (holding that
27   a decedent's estate is within RICO's definition of an enterprise).

28

1   interdependence of activities and persons involved. *Oki Semiconductor Co.*, 298

2   F.2d at 775.  White's agreement to facilitate and support Gomer's RICO violation[13]

3   can be inferred from the evidence.  (*SDF* at ¶¶ 139, 145, 154-157, 160-166, 172-

4   173, 179, 185-189, 195-196, 199, 200, 203.)

5

6   ### 3.  Foster's Breach of Fiduciary Duty Claim is Actionable.

7        As an affirmative defense, White bears the burden to prove that she may

8   avail herself of the limitations period set forth in section 340.6(a).  *Samuels v. Mix*,

9   22 Cal. 4th 1, 91 Cal. Rptr.2d 273, 277, 989 P.2d 701 (Cal. 1999).   The one-year

10  statute of limitations is tolled as long as the attorney "continues to represent the

11  plaintiff … [with regard to] the alleged act or omission." Cal. Code Civ. Proc. §

12  340.6(a)(2).   Continuity of representation depends upon evidence of an ongoing

13  mutual relationship and activities in furtherance of that relationship.   *Fritz v.*

14  *Ehrman*, 136 Cal. App.4th 1374, 1389, 39 Cal. Rptr.3d 670 (2006).

15

16       White continued to have a mutual relationship with Foster's agents and

17  engaged in activities with his agents long after December 2008, when White claims

18  her relationship with Foster ended. (*SDF* at ¶ 203.)  Foster's 2008 taxes were not

19  filed until September 28, 2009.  (*Id.*)  White admits that she talked to Foster's

20  guardian about how to treat the capital gains on Foster's sale of the CP shares.[14]

21

22       [13]Schemes predicated on false promises of marriage to acquire a victim's

23  property have long been recognized as prohibited schemes to defraud. *See Pereira*

24  *v. United States*, 347 U.S. 1 (1954).  As for the pattern, Gomer did not voluntarily

    terminate the scheme against Foster, so Gomer's pattern was open-ended. (*SDF* at

25  ¶ 205.)  Gomer's closed-ended pattern also lasted for almost three years.  (*Id.* at ¶

    206.)

26       [14] Foster's 2008 tax return does not confirm White's conclusion "that Alex's

27  estate owned 60,000 shares of CP stock contained in the DAF Trust." (*ECF 131-6*

28       20

1    (*Id.*)  One can infer that White provided further information and documents to

2    Foster's guardian throughout the guardianship proceedings. (*Id.*)  Because White

3    fails to establish when her relationship with Foster or his agents ceased to continue,

4    she has not sustained her burden under Rule 56.[15]

5

6    ### 4.  **Foster's Elder Abuse Claim is Actionable.**

7            Foster's counsel never admitted that White's fraud was limited to the

8    "creation of some documents."  (*ECF 130* at 21 (citing *131-16* at 27, ln. 21-23).)

9    White quotes the transcript out of context.

10                COURT:          Is the gist of your complaint that the estate-

11

12                planning documents were a result of some fraud?  Or is it that the

13                fraud is on the estate that [Defendants] depleted assets from the

14                estate?

15

16                MR. GRELL:      It's both.

17   (*SDF* at ¶ 208.)  The fraudulent actions of Defendants clearly depleted the assets of

18   Foster's estate.  (*Id.* at ¶ 209.)

19

20

21   _____

     at ¶ 10.)  The return merely evidences that Foster's guardian continued to rely on
22   White's corruptly influenced advice.  Moreover, if the shares were in the DAFT, it
     or its beneficiaries should have reported the capital gains. (*SDF* at ¶ 187.)  Rather
23   than supporting White's conclusion, Foster's reporting of capital gains evidences
     that he–or the Survivor's Trust–owned the shares at the time of their sale.
24
         [15] The duty of a fiduciary embraces the obligation to render a full and fair
25   disclosure to the beneficiary of all facts that materially affect his rights and
26   interests.  *Neel v. Levy, Levy, Cathcart & Gelfand*, 6 Cal.3d 176, 98 Cal. Rptr. 837,
     845, 491 P.3d 421 (1971).  As established in section A, White breached her
27   fiduciary duty of disclosure (among others) to Foster.

28
                21                                      CV11-1242 PA (DTBx)

5. **Evidence Supports Foster's Unjust Enrichment Claim.**

To state a claim for unjust enrichment, plaintiff must establish White's unjust retention of a benefit. *Lectrodryer v. SeoulBank,* 77 Cal.App.4th 723, 726, 91 Cal. Rptr.2d 881 (2000).   California courts interpret the term "benefit" to "denote any form of advantage." *See, e.g., Ghirardo v. Antonioli,* 14 Cal.4th 39, 51, 57 Cal. Rptr.2d 687, 924 P.2d 996 (1996).   For a benefit to be conferred, it is "not essential that money be paid directly to the recipient by the party seeking restitution." *California Fed. Bank v. Matreyek,* 8 Cal.App.4th 125, 132, 10 Cal.Rptr.2d 58 (1992).   Although Foster's legal fees were paid to White's law firm, one can infer that White received some advantage as the firm's originating attorney, responsible partner, and billing partner on Foster's file.   (*SDF* at 210.)

C.   **NONE OF FOSTER'S CLAIMS REQUIRE PROOF OF FOSTER'S MENTAL INCAPACITY.**

The portions of Foster's 2008 will and revocable trust that benefited Gomer were undone pursuant to the guardianship proceeding.   (*SDF* at ¶ 201.)   Thus, White's evidence concerning Foster's testamentary capacity in 2008 and cases concerning testamentary capacity in the context of a will contest are irrelevant to the issues in dispute.   (*ECF 130* § III(D) (citing *In re Perkins Estate*, 195 Cal. 699, 235 P. 45 (1925); *Santry v. France*, 327 Mass. 174 (1951).)

It is basic hornbook law that none of the claims[16] pled by Foster require proof of his mental incapacity. Moreover, common sense and the entire history of

---

[16] Under California's Elder Abuse Act, an "elder" is defined as "any person residing in this state, 65 years of age or older."   Cal. Wel. & Inst. Code § 15610.27; *see also id.* at § 15657.5.

22

jurisprudence dictate that a completely competent person can be defrauded or can be damaged by a defendant's breach of fiduciary duty or unjust enrichment.

Evidence of Foster's mental capacity simply establishes that he was more vulnerable than the ordinary person. *See United States v. Svete*, 556 F.3d 1157, 1167 (11th Cir. 2009) (the mail / wire fraud statutes do not differentiate between schemes that will ensnare the ordinarily prudent person and those that attract only those with lesser mental acuity); *see also Steeger v. Odell*, 18 Cal. 2d 409, 115 P.2d 977 (Cal. 1941) ("[n]o rogue should enjoy his ill-gotten plunder for the simple reason that [her] victim is by chance a fool").

## III.   **CONCLUSION**

For all the foregoing reasons, White's Motion for Summary Judgment should be denied.[17]

Dated: August 19, 2012          GRELL & FEIST, LLC

By:_____/s/_____
        Jeffrey E. Grell
        Attorneys for Plaintiff
        ESTATE OF DAVID R. FOSTER,
        by its Executor Sarah Foster

---

[17] Foster notes that, although the dispositive motion hearing deadline in this case is September 9, the discovery deadline in this case is September 2, 2013. (*ECF 101*.) On the morning of the day that Foster's opposition was due, several third parties produced documents or supplemented piror productions, which Foster's counsel was not able to review before filing this brief. (*JEG Dec.* at ¶¶ 71-77.) If the Court is inclined to grant, in whole or in part, the relief requested by White, the Court should enter an "order for continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken" or "issue any other just order" that will enable Foster to present additional evidence and arguments that may be discovered after the filing of this opposition. Fed. R. Civ. P. 56(f).

1

2
Additional and included counsel for Plaintiff:

3
Gary Kurtz, SBN 128295

4
**LAW OFFICE OF GARY KURTZ**
  A Professional Law Corporation

5
20335 Ventura Boulevard, Suite 200
Woodland Hills, California 91364

6
Telephone:   818-884-8400

7
Telefax:       818-884-8404

8
e-Mail:Gary@garykurtzlaw.com

9
M. David Blake

10
Clare Culhane
Law Offices of Blake & Associates

11
Old City Hall

12
45 School Street
Boston, MA 02108

13
617-723-3224

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CV11-1242 PA (DTBx)
PLAINTIFF'S OPPOSITION TO DEFENDANT
DONNA WHITE'S MOTION FOR SUMMARY JUDGMENT